# UNITED STATES *v.* TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

No. 386. Argued October 20, 23, 1911.—Decided April 22, 1912.

Whether the unification of terminals in a railroad center is a permissible facility in aid of interstate commerce, or an illegal combination in restraint thereof, depends upon the intent to be inferred from the extent of the control secured over the instrumentalities which such commerce is compelled to use, the method by which such control has been obtained, and the manner in which it is exercised.

The unification of substantially every terminal facility by which the traffic of St. Louis is served is a combination in restraint of interstate

trade within the meaning and purposes of the Anti-Trust Act of July 2, 1890, as the same has been construed by this court in *Standard Oil Co.* v. *United States*, 221 U. S. 1, and *United States* v. *American Tobacco Co.*, 221 U. S. 106.

The history of the unification of the railroad terminal systems in St. Louis in the Terminal Railroad Association shows an intent to destroy the independent existence of the terminal systems previously existing, to close the door to competition, and to prevent the joint use or control of the terminals by any non-proprietary company.

A provision in an agreement for joint use of terminals by non-proprietary companies on equal terms does not render an illegal combination legal where there is no provision by which the non-proprietary companies can enforce their right to such use.

Although the proprietary companies of a combination unifying terminals may not use their full power to impede free competition by outside companies, the control may so result in methods inconsistent with freedom of competition as to render it an illegal restraint under the Sherman Act.

This court bases its conclusion that the unification of the terminals in St. Louis is an illegal restraint on interstate traffic, and not an aid thereto, largely upon the extraordinary situation at St. Louis and upon the physical and topographical conditions of the locality.

A combination of terminal facilities, which is an illegal restraint of trade by reason of the exclusion of non-proprietary companies, may be modified by the court by permitting such non-proprietors to avail of the facilities on equal terms.

In this case *held* that the practices of the Terminal Association in not only absorbing other railroad corporations but in doing a transportation business other than supplying terminal facilities operated to the disadvantage of interstate commerce.

One of the fundamental purposes of the Anti-Trust Act is to protect, and not to destroy, the rights of property; and, in applying the remedy, injury to the public by the prevention of the restraint is the foundation of the prohibitions of the statute. *Standard Oil Co.* v. *United States*, 221 U. S. 1, 78.

Where the illegality of the combination grows out of administrative conditions which may be eliminated, an inhibition of the obnoxious practices may vindicate the statute, and where public advantages of a unified system can be preserved, that method may be adopted by the court.

In this case the objects of the Anti-Trust Act are best attained by a decree directing the defendants to reorganize the contracts unifying

the terminal facilities of St. Louis under their control so as to permit the proper and equal use thereof by non-proprietary companies, and abolishing the obnoxious practices in regard to transportation of merchandise.

Unless defendants, whose combination has been declared illegal by reason of administrative abuse, modify it to the satisfaction of the court so as to eliminate such abuse in the future, the court will direct a complete. disjoinder of the elements of the combination and enjoin the defendants from exercising any joint control thereover.

THE facts, which involve the validity under the Sherman Anti-trust Act of the Terminal Railroad Association of St. Louis, are stated in the opinion.

*Mr. E. C. Crow,* Special Assistant to the Attorney General, with whom *The Attorney General* and *Mr. Charles A. Houts,* United States Attorney, were on the brief, for appellant:

The record shows a plain violation of the Sherman Act of July 2, 1890.

Every contract, combination in the form of trust or otherwise, or conspiracy, in undue restraint of trade or commerce among the several States or foreign nations, is illegal. See § 1.

Monopolizing, or attempting, combining or conspiring to monopolize interstate or foreign trade or commerce is illegal. See § 2.

Certain fundamental considerations control. The statute is aimed at restrictions upon interstate commerce. Given a reasonable construction, as it must receive, its purpose is to permit commerce between the States and with foreign nations to flow in its natural channels unrestricted by any combinations, contracts, conspiracies, or monopolies whatsoever. *Hopkins* v. *United States,* 171 U. S. 586; *Loewe* v. *Lawlor,* 208 U. S. 274.

Combinations between competing railroads engaged in interstate commerce to unduly restrain commerce and combinations between *media* or instruments of interstate

commerce fall within the prohibition of the act. *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 319; *United States* v. *Joint Traffic Association*, 171 U. S. 505; *Addyston Pipe &c. Co.* v. *United States*, 175 U. S. 244; *Northern Securities Co.* v. *United States*, 193 U. S. 197; *Anderson* v. *United States*, 171 U. S. 604; *Standard Oil Co.* v. *United States*, 221 U. S. 1.

To monopolize interstate commerce, or the *media*, or instruments of interstate commerce, is to secure, or adopt measures which may bring about an exclusive control of such commerce or of such instruments of commerce so as to prevent others from engaging therein, or using such instruments of commerce. *In re Green*, 52 Fed. Rep. 115; *Northern Securities Co.* v. *United States*, 193 U. S. 197, 402; *United States* v. *American Tobacco Co.*, 164 Fed. Rep. 700; *United States* v. *Knight*, 156 U. S. 1.

It is not necessary to bring a combination within the act, that the result of its operation shall be complete restraint or monopoly, or that it shall have resulted in actual injury to the public. It is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition. *United States* v. *Chesapeake &c. Fuel Co.*, 115 Fed. Rep. 610; *United States* v. *E. C. Knight Co.*, 156 U. S. 16; *Northern Securities Co.* v. *United States*, 193 U. S. 197; *Chattanooga &c. Works* v. *Atlanta*, 203 U. S. 390.

The Terminal Association is necessarily engaged in interstate commerce. *United States* v. *Union Stock Yards*, 161 Fed. Rep. 919; *United States* v. *Colorado &c. R. R.*, 157 Fed. Rep. 321; *United States* v. *R. P. T. Co.*, 144 Fed. Rep. 861.

*Mr. H. S. Priest*, with whom *Mr. T. M. Pierce* was on the brief, for appellees:

The terminal service necessary to be done in a great city may, any or all of it, be done by the railroad com-

panies for themselves.  A company may build its own line connecting with another road on the other side of the city, and it may use its own wagons to receive and deliver freight at store doors.

This, and no more, the railroad companies of St. Louis have done.  They have acquired the terminal facilities of St. Louis for themselves and are operating them as a part ·of the instrumentalities of their business.  That each one might do this if the instrumentalities employed were its own is conceded, but it is denied that they may combine with each other for that purpose.

The unitary system is in accord with public policy.

Terminal service is a matter of internal economy which the companies may adjust to mutual advantage and no arrangement respecting it operates to restrict competition between them as to the transportation service for the public in which they are engaged.

Whatever facility railroad companies may use in common they may own in common.  Common arrangements affecting internal economy have never been held to be in violation of public policy and whenever, in the advance of civilization, they have suggested themselves as feasible, they have been recognized by law, and appropriate regulations have been prescribed for them.  In the country every man builds independently.  In the crowded section of a great city, however, if all construction were done independently, the waste in space and the increase in cost of construction would be very great.

Community of use of terminals in a large city is more than a matter of convenience, or economy; it is an absolute public necessity.

Under the Interstate Commerce Law, and indeed under the common law of the land, tolls must be reasonable, and the Government has the power to make them so if they are not.  The charges of extortion and that the proprietary railroad companies compel all other railroad companies to

use the facilities are not true. There is, indeed, a compulsion, but it is inherent in the situation. The other companies use the terminal property because it is not possible to acquire adequate facilities for themselves. The cost to any one company is prohibitive.

Every consideration of a public nature points to a consolidation of the terminals and to a common use of them by all the railroad companies coming into the city. But to avoid the odious phases of a monopoly, this use must be open to all upon equal terms. The charge for service in any case can be stated in one word—cost. No money received for the service rendered goes to any other purpose than paying expenses of operation, taxes, fixed charges, and proper maintenance. No dividends are paid upon terminal shares, and no proprietary railroad company is a beneficiary of fixed charges. Any new railroad built into St. Louis now has but to secure a way to a terminal track and it has at once the advantages of the entire terminal system.

The public policy of the country as indicated by statutory enactments has been in favor of combination by railroad companies whenever any common matter of internal economy is involved, and also where the combination is in the nature of connecting lines of railroad for the purposes of continuous transportation. Two bridges across a great river, where one will serve, do not facilitate commerce, but burden it with an unnecessary charge.

Common use of the same facilities by different railroad companies has not only been approved, but has been enforced whenever there has been good reason therefor. Act of March 3, 1875, 18 Stat. 510; §§ 1164, 1165, Rev. Stat. Missouri; Union Depot acts of the State of Illinois; April 7, 1875; of Alabama; of February 15, 1907, of Indiana; Burns' Ann. Stat., Col. 2, §§ 5345, 5374; of Iowa, §§ 2099 to 2102, Annotated Code of 1897; of Maine, 60, 51, Rev. Stat. 1903; and of Michigan, Chap.

166, Comp. Laws, 1897; of Minnesota, Act of March 5, 1879; of Nebraska, Chap. 20, Laws of 1887, § 1816, Comp. Stat. 1901; of Ohio, Chap. 3, Tit. 2, 2 Bates' Ann. Stats.; of South Carolina, Code of 1902, Vol. 1, 813; of Tennessee, §§ 2429 to 2437, Code of 1896; of Texas, Chap. 16a, Civil Stat. 1897; of Virginia, § 1294, Code 1904. See Acts of Congress relating to Union Station in Washington, D. C.

It would be singular indeed, if all of the States severally, and the United States as well, were giving their sanction to arrangements and agreements which are in violation of the Sherman Act, and it is much more probable that a construction of that act leading to such a result is entirely without warrant.

Union terminals have been frequently before the courts for consideration, and have always been recognized and approved as legitimate agencies in the work of railroad transportation. *State* v. *Terminal R. R. Assn.*, 182 Missouri, 284; *Bernard* v. *Cheeseman*, 7 Colorado, 376; *Central Railroad Company* v. *Perry*, 58 Georgia, 461; *Birdwell* v. *Gate City Terminal Co.* (Ga.), 10 L. R. A. (N. S.) 909; *Indianapolis Union Railway Co.* v. *Cooper*, 6 Ind. App. 202; *Reisner* v. *Strong*, 24 Kansas, 410; *State* v. *Martin*, 51 Kansas, 462; *Mayor* v. *Norwich R. R. Co.*, 109 Massachusetts, 103; *Mayor* v. *Railroad Commissioners*, 113 Massachusetts, 161; *Union Depot Co.* v. *Morton*, 83 Michigan, 265; *Detroit Station* v. *Detroit*, 88 Michigan, 347; *State* v. *St. Paul Union Depot Co.*, 42 Minnesota, 142; *St. Paul Union Depot Co.* v. *M. & N. R. Co.*, 47 Minnesota, 154; *Chicago, St. Paul & Kansas C. Ry. Co.* v. *Union Depot Ry. Co.*, 54 Minnesota, 411; *Dewey* v. *Railroad*, 142 N. Car. 392; *Riley* v. *Union Station Co.*, 71 S. Car. 457; *Ryan* v. *Terminal Co.*, 102 Tennessee, 124; *Collier* v. *Union Railway Co.*, 113 Tennessee, 96; *Joy* v. *St. Louis*, 138 U. S. 1; *C., R. I. & P. Ry. Co.* v. *U. P. Ry. Co.*, 47 Fed. Rep. 15; *S. C.*, 51 Fed. Rep. 309, and 163 U. S. 564.

The arrangement in question is not in restraint of trade or commerce among the several States, or a monopoly of any part of the trade or commerce among the several States.

Counsel for the Government confuse the operation of the railroad and the cost of it, with the service rendered to the public and the charge for it. The Sherman Act has nothing to do with the former; its restrictions fall altogether upon the latter. No matter how many subordinate agencies of transportation different railroad companies employ in common, no matter how many combinations they may make to secure economy in operation, so long as they do not pool their business or their earnings, so long as they are left free in their relations to the shipping and traveling public, every motive of self-interest remains to incite to competition. And when economy of operation, however accomplished, reduces costs, the end hoped for, through competition, commerce is aided, and charges are reduced to a still lower level.

*Mr. John C. Higdon*, by leave of the court, filed a brief as *amicus curiæ*.

Mr. Justice Lurton delivered the opinion of the court.

The United States filed this bill to enforce the provisions of the Sherman Act of July 2, 1890, c. 647, 26 Stat. 209, against thirty-eight corporate and individual defendants named in the margin,[1] as a combination in re-

---

[1] The Terminal Railroad Association of St. Louis; The St. Louis Merchants' Bridge Terminal Railway Company; The Wiggins Ferry Company; The St. Louis Bridge Company; The St. Louis Merchants' Bridge Company; The Missouri, Kansas & Texas Railway Company; The St. Louis & San Francisco Railway Company; The Chicago & Alton Railway Company; The Baltimore & Ohio Southwestern Railroad Company; The Illinois Central Railroad Company; The St. Louis, Iron Mountain & Southern Railway Company; The Chicago, Burling-

straint of interstate commerce and as a monopoly forbidden by that law. The cause was heard by the four Circuit Judges, who, being equally divided in judgment, dismissed the bill, without filing an opinion. From this decree the United States has appealed.

The principal defendant is the Terminal Railroad Association of St. Louis, hereinafter designated as the Terminal Company. It is a corporation of the State of Missouri, and was organized under an agreement made in 1889 between Mr. Jay Gould and a number of the defendant railroad companies for the express purpose of acquiring the properties of several independent terminal companies at St. Louis with a view to combining and operating them as a unitary system.

The terminal properties first acquired and combined into one system by the Terminal Company comprised the following: The Union Railway & Transit Company of St. Louis and East St. Louis; The Terminal Railroad of St. Louis and East St. Louis; The Union Depot Company of St. Louis; The St. Louis Bridge Company, and the Tunnel Railroad of St. Louis. These properties included the great union station, the only existing railroad bridge— the Eads or St. Louis Bridge—and every connecting or terminal company by means of which that bridge could be used by railroads terminating on either side of the river. For a time this combination was operated in com-

ton & Quincy Railway Company; The St. Louis, Vandalia & Terre Haute Railroad Company; The Wabash Railroad Company; The Cleveland, Cincinnati, Chicago & St. Louis Railway Company; The Louisville & Nashville Railroad Company; The Southern Railway Company; The Chicago, Rock Island & Pacific Railway Company; The Missouri Pacific Railway Company; The Central Trust Company of New York; A. A. Allen; S. M. Felton, A. J. Davidson, W. M. Green, J. T. Harahan, C. S. Clarke, H. Miller, Benjamin McKean, Joseph Ramsey, George E. Evans, C. E. Schaff, T. C. Powell, J. F. Stevens, A. G. Cochran, W. S. McChesney, Julius Walsh, V. W. Fisher and S. D. Webster.

petition with the terminal system of the Wiggins Ferry Company, and upon the completion of the Merchants' Bridge, in competition with it, and a system of terminals which were organized in connection with it. The Wiggins Ferry Company had for many years operated car transfer boats by means of which cars were transferred between St. Louis and East St. Louis.

Upon each side of the river it owned extensive railway terminal facilities, with which connection was maintained with the many railroads terminating on the west and east sides of the river, which gave such roads connection with each other, as well as access to many of the industrial and business districts on each side. In 1890 a third terminal system was opened up by the completion of a second railroad bridge over the Mississippi River at St. Louis, known as the Merchants' Bridge. This was a railroad toll bridge, open to every railroad upon equal terms. That it might forever maintain the potentiality of competition as a railroad bridge, the act of Congress authorizing its construction provided that no stockholders in any other railway bridge company should become a stockholder therein. But as this was a mere bridge company, it was essential that railroad companies desiring to use it should have railway connections with it on each side of the river. For this purpose two or more railway companies were organized and lines of railway were constructed connecting each end of the Merchants' Bridge with various railroad systems terminating on either side of the river. The Merchants' Bridge and its allied terminals were thereby able to afford many, if not all, of the railroads coming into St. Louis, access to the business districts on both sides of the river, and connection with each other.

Thus, for a time, there existed three independent methods by which connection was maintained between railroads terminating on either side of the river at St. Louis: First, the original Wiggins Ferry Company, and

its railway terminal connections; second, The Eads Railroad Bridge and the several terminal companies by means of which railroads terminating at St. Louis were able to use that bridge and connect with one another, constituting the system controlled by the Terminal Company, and, third, The Merchants' Bridge and terminal facilities owned and operated by companies in connection therewith.

This resulted in some cases in an unnecessary duplication of facilities, but it at least gave to carriers and shippers some choice, a condition which, if it does not lead to competition in charges, does insure competition in service. Important as were the considerations mentioned, their independence of one another served to keep open the means for the entrance of new lines to the city, and was an obstacle to united opposition from existing lines. The importance of this will be more clearly seen when we come to consider the topographical conditions of the situation.

That the promotors of the Terminal Company designed to obtain the control of every feasible means of railroad access to St. Louis, or means of connecting the lines of railway entering on opposite sides of the river, is manifested by the declarations of the original agreement, as well as by the successive steps which followed. Thus, the proviso in the act of Congress authorizing the construction of the Merchants' Bridge, which forbade the ownership of its stock by any other bridge company or stockholder in any such company, was eliminated by an act of Congress, and shortly thereafter the Terminal Company obtained stock control of the Merchants' Bridge Company, and of its related terminal companies, and likewise a lease.

The Wiggins Ferry Company owned the river front on the Illinois shore opposite St. Louis for a distance of several miles. It had on that side and on its own property, switching yards and other terminal facilities. From these yards extended lines of rails which connected with its car transfer boats and with the termini of railroads on the Illinois side.

On the St. Louis side of the river it had like facilities by which it was in connection with railway lines terminating on that side. That company was, consequently, able to interchange traffic between the systems on opposite sides of the river and to serve many industries. In 1892 the Rock Island Railroad Company endeavored to obtain an independent entrance to the city. For this purpose it sought to acquire the facilities owned by the Wiggins Ferry Company by securing a control of its capital stock. This was not deemed desirable by the railroad companies which jointly owned the Terminal Company's facilities, and to prevent this acquisition effort was made to secure control of the stock. The competition was fierce and the market price of the shares pushed to an abnormal price. The final result being in doubt, an agreement was reached by which the Rock Island Company was admitted to joint ownership with the other proprietary companies in all of the terminal properties which were operated by the Terminal Company or which should be acquired by it. The shares in the Ferry Company bought by the Rock Island were transferred to the Terminal Company at cost and were paid for by that company. These shares, united with those which had been acquired by the Terminal Company, enabled the latter to absorb the properties of the Ferry Company, and thus the three independent terminal systems were combined into a single system.

We come, then, to the question upon which the case must turn: Has the unification of substantially every terminal facility by which the traffic of St. Louis is served resulted in a combination which is in restraint of trade within the meaning and purpose of the Anti-trust Act?

It is not contended that the unification of the terminal facilities of a great city where many railroad systems center is, under all circumstances and conditions, a combination in restraint of trade or commerce. Whether it is a facility in aid of interstate commerce or an unreason-

able restraint forbidden by the act of Congress, as construed and applied by this court in the cases of *The Standard Oil Company* v. *The United States*, 221 U. S. 1, and *The United States* v. *American Tobacco Company*, 221 U. S. 106, will depend upon the intent to be inferred from the extent of the control thereby secured over instrumentalities which such commerce is under compulsion to use, the method by which such control has been brought about and the manner in which that control has been exerted.

The consequence to interstate commerce of this combination cannot be appreciated without a consideration of natural conditions greatly affecting the railroad situation at St. Louis. Though twenty-four lines of railway converge at St. Louis, not one of them passes through. About one-half of these lines have their termini on the Illinois side of the river. The others, coming from the west and north, have their termini either in the city or on its northern edge. To the river the city owes its origin, and for a century and more its river commerce was predominant. It is now the great obstacle to connection between the termini of lines on opposite sides of the river and any entry into the city by eastern lines. The cost of construction and maintenance of railroad bridges over so great a river makes it impracticable for every road desiring to enter or pass through the city to have its own bridge. The obvious solution is the maintenance of toll bridges open to the use of any and all lines upon identical terms. And so the commercial interests of St. Louis sought to solve the question, the system of car ferry transfer being inadequate to the growing demands of an ever-increasing population. The first bridge, called the Eads Bridge, was, and is, a toll bridge. Any carrier may use it on equal terms. But to use it there must be access over rails connecting the bridge and the railway. On the St. Louis side the bridge terminates at the foot of the great hills upon which the city is built; on the Illinois side it

ends in the low and wide valley of the Mississippi. This
condition resulted in the organization of independent
companies which undertook to connect the bridge on each
side with the various railroad termini. On the Missouri
side it was necessary to tunnel the hills, that the valley
of Mill Creek might be reached, where the roads from
the west had their termini. Thus, though the bridge might
be used by all upon equal terms, it was accessible only by
means of the several terminal companies operating lines
connecting it with the railroad termini.

This brought about a condition which led to the con-
struction of the second bridge, the Merchants' Bridge.
This, too, was, and is, a toll bridge, and may be used by all
upon equal terms. To prevent its control by the Eads
Bridge Company, it was carefully provided that no stock-
holder in any other bridge company should own its shares.
But this Merchants' Bridge, like the Eads Bridge, had no
rail connections with any of the existing railroad systems,
and these facilities, as in the case of the Eads Bridge,
were supplied by a number of independent railway com-
panies who undertook to fill in the gaps between the bridge
ends and the termini of railroads on both sides of the river.
It must be also observed that these terminal companies
were in many instances so supplied with switch connections
as not only to connect with the bridge, but also served to
connect such roads with each other and with the industries
along their lines. Now, it is evident that these lines con-
necting railroad termini with the railroad bridges domi-
nated the situation. They stood, as it were, just outside
the gateway, and none could enter, though the gate stood
open, who did not comply with their terms. The topo-
graphical situation making access to the city difficult does
not end with the river. The city lies upon a group of
great hills which hug the river closely and rapidly recede
to the west. These hills are penetrated on the west by the
narrow valley of Mill Creek, which crosses the city about

its center. Railways coming from the west use this valley, but its facilities are very restricted and now quite occupied. North of the city the hills drop back from the river gradually, and there exists a valley formed by the Mississippi and Missouri rivers. Railroads coming from the north on the west side of the river come by this valley. As we have stated before, the valley of the Mississippi at St. Louis is on the Illinois side of the river. Railroads coming from the east, northeast and southeast have their termini in that valley. As a consequence, there have grown up numerous cities and towns of some consequence as manufacturing places, the chief of which is East St. Louis.

The result of the geographical and topographical situation is that it is, as a practical matter, impossible for any railroad company to pass through, or even enter St. Louis, so as to be within reach of its industries or commerce, without using the facilities entirely controlled by the Terminal Company. The averment of the bill that the railroad companies, here defendants, being the sole stockholders of the Terminal Company, as we shall later see, compel all other railroad companies converging at St. Louis to use the facilities owned and operated by the Terminal Company, is, therefore, borne out by the facts of the situation. Nor is this effect denied, for the learned counsel representing the proprietary companies, as well as the Terminal Company, say in their filed brief: "There indeed is compulsion; but it is inherent in the situation. The other companies use the terminal properties because it is not possible to acquire adequate facilities for themselves. The cost to any one company is prohibitive." Obviously, this was not true before the consolidation of the systems of the Wiggins Ferry Company and the Merchants' Bridge Company with the system theretofore controlled by the Terminal Company. That the non-proprietary companies might have been compelled to use the instrumentalities of one or the other of the three systems then available, and

that the advantages secured might not have been so great as those offered by the unified system now operated by the Terminal Company, must be admitted. But that there existed before the three terminal systems were combined a considerable measure of competition for the business of the other companies, and a larger power of competition, is undeniable. That the fourteen proprietary companies did not then have the power they now have to exclude either existing roads not in the combination, or new companies, from acquiring an independent entrance into the city, is also indisputable. The independent existence of these three terminal systems was, therefore, a menace to complete domination as keeping open the way for greater competition. Only by their absorption or some equivalent arrangement was it possible to exclude from independent entrance the Rock Island Company, or any other company which might desire its own terminals. To close the door to competition large sums were expended to acquire stock control. For this purpose the obligations of the absorbed companies were assumed and new funds obtained by mortgages upon the unified system.

The physical conditions which compel the use of the combined system by every road which desires to cross the river, either to serve the commerce of the city or to connect with lines separated by the river, is the factor which gives greatest color to the unlawfulness of the combination as now controlled and operated. If the Terminal Company was in law and fact the agent of all, the mere unification which has occurred would take on quite a different aspect. It becomes, therefore, of the utmost importance to know the character and purpose of the corporation which has combined all of the terminal instrumentalities upon which the commerce of a great city and gateway between the East and West must depend. The fact that the Terminal Company is not an independent corporation at all is of the utmost significance. There

are twenty-four railroads converging at St. Louis. The relation of the Terminal Company is not one of impartiality to each of them. It was organized in 1889, at the instance of six of these railroad companies, for the purpose of acquiring all existing terminal instrumentalities for the benefit of the combination, and such other companies as they might thereafter admit to joint ownership by unanimous consent, and upon a consideration to be agreed upon. From time to time other companies came to an agreement with the original proprietors until, at the time this bill was filed, the properties unified were held for the joint use of the fourteen companies made defendants. In the contract of 1889, above referred to, the purpose of acquiring the first terminals combined, is declared to be, "that said properties may be held in perpetuity as a unit and developed and improved in the interest of the proprietary companies, for the purpose of furnishing adequate terminal facilities in St. Louis and East St. Louis." This purpose was carried out by the conveyance to "each of the proprietary companies . . . forever a right of joint use with each other and such other companies as may be admitted as proprietary lines to joint use thereof, of all said terminal properties . . . now held or that may be hereafter acquired in St. Louis and East St. Louis, . . . it being understood that the right herein granted to each proprietary company is not transferable to any extent whatever, but is to remain as an appurtenant to the railroad now owned by each proprietary company "

That these facilities were not to be acquired for the benefit of any railroad company which might desire a joint use thereof was made plain by a provision in the contract referred to which stipulated that other railroad companies not named therein as proprietary companies might only be admitted "to joint use of said terminal system on unanimous consent, but not otherwise, of the

directors of the first party, and on payment of such a consideration as they may determine, and on signing this agreement," etc. Inasmuch as the directors of the Terminal Company consisted of one representative of each of the proprietary companies, selected by itself, it is plain that each of said companies had and still has a veto upon any joint use or control of terminals by any non-proprietary company.

By that and the supplemental agreement of December, 1902, the Ferry Company and the Merchants' Bridge Company having then been absorbed, the proprietary companies prescribed that the charges of the company shall be so adjusted as to produce no more revenue than shall equal the fixed charges, operating and maintenance expenses. Deficiencies for those purposes the proprietary companies guarantee to make good, though such payments are to be reimbursed by an increase in charges, if necessary.

We fail to find in either of the contracts referred to any provision abrogating the requirement of unanimous consent to the admission of other companies to the ownership of the Terminal Company, though counsel say that no such company will now find itself excluded from joint use or ownership upon application. That other companies are permitted to use the facilities of the Terminal Company upon paying the same charges paid by the proprietary companies seems to be conceded. But there is no provision by which any such privilege is accorded.

By still another clause in the agreement the proprietary companies obligate themselves to forever use the facilities of the Terminal Company for all business destined to cross the river. This would seem to guarantee against any competitive system, since the companies to the agreement now control about one-third of the railroad mileage of the United States.

In acquiring these properties the Terminal Company has assumed mortgage and stock dividend obligations of

the constituent companies aggregating about twenty-five million dollars. It has executed its own mortgage upon all of its property to secure an issue of fifty million dollars of bonds, of which twenty million dollars worth have been sold, and the proceeds used in construction or in paying for the properties acquired. It has thus about forty-five million dollars of mortgage or fixed charges or liabilities. The company has an authorized capital stock of fifty million dollars. Of this about twenty-eight million dollars has been issued in equal proportions, to the several owning railroad companies. No dividends have ever been paid, and the company disclaims any purpose to pay dividends. We fail to find any obligation by which they may be prevented from paying dividends upon the stock held by the proprietary companies, or that in its treasury, if ever issued. Undoubtedly, the major part of this revenue arises from the business done by the proprietary companies through the Terminal Company, but that coming from other companies is, however, a large contribution. That no direct profit is derived by the owning companies from the operation of the terminals, may be true. But it is not clear that the proprietary companies do not make an indirect profit through ownership of obligations of the absorbed companies.

That through their ownership and exclusive control they are in possession of advantages in respect to the enormous traffic which must use the St. Louis gateway, is undeniable. That the proprietary companies have not availed themselves of the full measure of their power to impede free competition of outside companies, may be true. Aside from their power under all of the conditions to exclude independent entrance to the city by any outside company, their control has resulted in certain methods which are not consistent with freedom of competition. To these acts we shall refer later.

We are not unmindful of the essential difference be-

tween terminal systems properly so described and railroad transportation companies. The first are but instrumentalities which assist the latter in the transfer of traffic between different lines, and in the collection and distribution of traffic. They are a modern evolution in the doing of railroad business, and are of the greatest public utility. They, under proper conditions, do not restrain, but promote commerce.

The argument that the combination of the instrumentalities operated by the Terminal Company with those of the Merchants' Bridge Company was a combination of two competing lines of railroad, such as was condemned in *Northern Securities Company* v. *United States*, 193 U. S. 197, is not well founded. This combination if properly regarded as of parallel and competing lines would have been obnoxious to the seventeenth section of the constitution of Missouri. For the purpose of enforcing this Missouri prohibition, the State instituted a proceeding to dissolve the combination of the properties of the Merchants' Bridge Terminal Railroad Company with the Terminal Railroad Association of St. Louis, upon the ground that the railroads operated by those companies were parallel and competing lines of railroad. Relief was denied. The Missouri court held that the merger of mere railway terminals used to facilitate the public convenience by the transfer of cars from one line of railway to another, and instrumentalities for the distribution or gathering of traffic, freight or passenger, among scattered industries, or to different business centers of a great city, were not properly railroad companies within the reasonable meaning of the statutes forbidding combinations between competing or parallel lines of railroad. Referring to the legitimate use of terminal companies, the Missouri court said:

"A more effectual means of keeping competition up to the highest point between parallel or competing lines could not be devised. The destruction of the system would re-

sult in compelling the shipper to employ the railroad with which he has switch connection, or else cart his product to a distant part of the city, at a cost possibly as great as the railroad tariff.

"St. Louis is a city of great magnitude in the extent of its area, its population, and its manufacturing and other business. A very large number of trunk line railroads converge in this city. In the brief of one of the well-informed counsel in this case it is said that St. Louis is one of the largest railroad centers in the world. Suppose it were required of every railroad company to effect its entrance to this city as best it could and establish its own terminal facilities, we would have a large number of passenger stations, freight depots and switch yards scattered all over the vast area and innumerable vehicles employed in hauling passengers and freight to and from those stations and depots. Or suppose it became necessary in the exigency of commerce that all incoming trains should reach a common focus, but every railroad company provide its own track; then not only would the expense of obtaining the necessary rights of way be so enormous as to amount to the exclusion of all but a few of the strongest roads, but, if it could be accomplished, the city would be cut to pieces with the many lines of railroad intersecting it in every direction, and thus the greatest agency of commerce would become the greatest burden." 182 Missouri, 284, 299.

Among the cases in which the public utility of such companies has been recognized are: *Bridwell* v. *Gate City Terminal Co.* (Georgia), 10 L. R. A. (N. S.) 909; *Indianapolis Union Railroad Company* v. *Cooper*, 6 Ind. App. 202; *State ex rel.* v. *Martin*, 51 Kansas, 462; *Mayor* v. *Norwich E. W. Railroad Co.*, 109 Massachusetts, 103; *Union Depot Company* v. *Morton*, 83 Michigan, 265; *State* v. *St. Paul Union Depot Co.*, 42 Minnesota, 142; *Ryan* v. *Terminal Co.*, 102 Tennessee, 111, 124.

While, therefore, the mere combining of several independent terminal systems into one may not operate as a restraint upon the interstate commerce which must use them, yet there may be conditions which will bring such a combination under the prohibition of the Sherman Act. The one in question, counsel say, is not antagonistic to but in harmony with the Anti-trust Act, "because it expands competition by extending equal conveniences and advantages to all shippers located upon each of the three systems for all traffic to and from St. Louis; expedites and economizes the service." It is justified, they argue by "(1) the physical or topographical conditions peculiar to the locality; by (2) its commercial, industrial and railroad development and history; by (3) public opinion expressed legislatively and judicially, and (4) by the judgment of experienced railroad engineers and managers." From which consideration the same counsel say that the issue presented by this record is, "whether the common control or ownership of all the terminal facilities (mechanical devices for the exchange, receipt and distribution of traffic) of a large commercial and manufacturing center by all of the railroad companies, and for the benefit of all upon equal terms and facilities, without discrimination, is condemned by the Sherman act."

Let us analyze the proposition included in the issue, as stated by counsel, quoted above: Counsel assume that the combined terminals have come under a "common control or ownership." But this is not the case. That the instrumentalities so combined are not jointly owned or managed by all of the companies compelled to use them is a significant fact which must be taken into account for the purpose of determining whether there has been a violation of the Anti-trust Act. The control and ownership is that of the fourteen roads which are defendants. The railroad systems and the coal roads converging at St. Louis, which are not associated with the proprietary companies are

under compulsion to use the terminal system, and yet have no voice in its control.

It cannot be controverted that, in ordinary circumstances, a number of independent companies might combine for the purpose of controlling or acquiring terminals for their common but exclusive use. In such cases other companies might be admitted upon terms or excluded altogether. If such terms were too onerous, there would ordinarily remain the right and power to construct their own terminals. But the situation at St. Louis is most extraordinary, and we base our conclusion in this case, in a large measure, upon that fact. The "physical or topographical condition peculiar to the locality," which is advanced as a prime justification for a unified system of terminals, constitutes a most obvious reason why such a unified system is an obstacle, a hindrance and a restriction upon interstate commerce, unless it is the impartial agent of all who, owing to conditions, are under such compulsion, as here exists, to use its facilities. The witness upon whom the defendants chiefly rely to uphold the advantages of the unified system which has been constructed, Mr. Albert L. Perkins, gives this as his unqualified judgment. He was and is an experienced railroad engineer and manager and is the railway expert of the Municipal Bridge and Terminal Board, a commission appointed under a city ordinance, headed by the mayor, to study and report legislation needed to relieve the terminal conditions of St. Louis. From his study of the local situation he expresses the opinion that the terminals of railway lines in any large city should be unified as far as possible, and that such unification may be of the greatest public utility and of immeasureable advantage to commerce, state and interstate. Neither does he find in the conditions at St. Louis any insurmountable objection to such unification. The witness, however, points out that such a terminal company should be the agent of every

company, and, furthermore, that its service should not be for profit or gain. In short, that every railroad using the service should be a joint owner and equally interested in the control and management. This, he thinks, will serve the greatest possible economy, and will give the most efficient service without discrimination. When thus jointly owned and controlled, whether through the medium of a mere holding or operating company, such as the Terminal Company is, or by other means, the facilities would belong to each relatively to its own business and delivery would be made by each company over its own tracks to connecting lines or places of destination in the city. The charge for the haul thus lengthened would then be properly absorbed by the through rate, leaving nothing to be added to that to be charged the shipper or consignee but switching and storage charges proper.

The terminal properties in question are not so controlled and managed, in view of the inherent local conditions, as to escape condemnation as a restraint upon commerce. They are not under a common control and ownership. Nor can this be brought about unless the prohibition against the admission of other companies to such control is stricken out and provision made for the admission of any company to an equal control and management upon an equal basis with the present proprietary companies.

There are certain practices of this Terminal Company which operate to the disadvantage of the commerce which must cross the river at St. Louis, and of non-proprietary railroad lines compelled to use its facilities. One of them grows out of the fact that the Terminal Company is a terminal company and something more. It does not confine itself to supplying and operating mere facilities for the interchange of traffic between railroads and to assistance in the collecting and distributing of traffic for the carrier companies. It, as well as several of the absorbed

terminal companies, were organized under ordinary railroad charters.  If the combination which has occurred is to escape condemnation as a combination of parallel and competing railroad companies, it is because of the essential difference between railroad and terminal companies proper—differences pointed out by the Missouri Supreme Court in the case heretofore referred to.  Indeed, the defense to this proceeding is based upon the insistence that the Terminal Company is solely engaged in operating terminal facilities, defined in the briefs, "as mechanical devices for the exchange, receipt and distribution of traffic."  This Terminal Company, in addition to its schedule for terminal charges proper, such as switching, warehousing, etc., files its rate-sheets for the transportation of every class of merchandise from the termini of the railroads on the Illinois side of the river to destinations across the river over its lines.  These rates are applied to all traffic destined to cross the river, with certain exceptions to which we shall later refer, which originates within an irregular area of which St. Louis is the center, and having a diameter of from one to two hundred miles.  This arbitrary operates to cast a burden upon short hauls, which has led to much complaint, as being both discriminatory and extortionate.  An exception is made as to traffic originating within so much of this area as constitutes what is called "Green Line Territory," or which is destined to points within "Green Line Territory."  This seems to be based upon competitive conditions caused by the great toll railway bridge at Memphis, Tennessee, the bridge toll being treated by lines using the bridge as a part of the through rate.

Another exception to the rule imposing this arbitrary is that it does not apply to traffic which originates in East St. Louis, whether it is destined to cross the river or not.  The reason for this exemption, where such traffic does cross the river, is not apparent.  Possibly, it may be said

that it is because the traffic of St. Louis and East St. Louis should be treated as arising in the same commercial area. But this reason does not seem to apply to the traffic originating in St. Louis, which is bound east, though that of East St. Louis is altogether free from this arbitrary charge. The effect of this arbitrary discrimination is obviously injurious to the commerce and manufacturers of St. Louis, and is among the chief causes of complaint against the Terminal Company. Mr. Perkins, to whom we have before referred as a capable and impartial expert, says of the consequence of this curious exception out of the one hundred mile area rule, that "the effect of these charges was, of course, to put the man doing business in St. Louis at a disadvantage to that extent with the man doing business at East St. Louis on his eastern business." Again he says, that the practical operation was to give East St. Louis a distinct advantage in the manufacturing lines. Another practice which marks this Terminal Company as a transportation company which interposed itself between railroads having their termini on opposite sides of the river, and between the city itself and the roads terminating on the east side of the river, is that all traffic destined to cross the river at St. Louis, whether bound east or west, or destined for the city if coming from the east, is billed only to East St. Louis, and there rebilled to destination.

The practice of rebilling and of making a distinct hauling charge is an evident survival of the methods which existed when the eastern lines had no termini in St. Louis. They then billed to East St. Louis, and there turned the traffic over to one of the existing terminal companies, who made their own specific charges for the haul to places of delivery within the city. The practice has been continued after the reason for it has disappeared. The effect of this practice of rebilling at East St. Louis and of imposing this arbitrary upon traffic originating within

one hundred miles of the city, destined to cross the river, seems to have been also applied to the large coal traffic between the Illinois coal mines, upon which the city is largely dependent.

We come now to the remedy. In determining what this should be we, as said by this court in *Standard Oil Company* v. *United States*, 221 U. S. 1, 78, must not overlook the fact that in applying a remedy "that injury to the public by the prevention of an undue restraint on, or the monopolization of trade or commerce is the foundation upon which the prohibitions of the statute rest, and moreover that one of the fundamental purposes of the statute is to •protect, not to destroy, rights of property." If, as we have already said, the combination of two or more mere terminal companies into a single system does not violate the prohibition of the statute against contracts and combinations in restraint of interstate commerce, it is because such a combination may be of the greatest public utility. But when, as here, the inherent conditions are such as to prohibit any other reasonable means of entering the city, the combination of every such facility under the exclusive ownership and control of less than all of the companies under compulsion to use them violates both the first and second sections of the act, in that it constitutes a contract or combination in restraint of commerce among the States and an attempt to monopolize commerce among the States which must pass through the gateway at St. Louis.

The Government has urged a dissolution of the combination between the Terminal Company, the Merchants' Bridge Terminal Company and the Wiggins Ferry Company. That remedy may be necessary unless one equally adequate can be applied.

But the illegal restraint upon commerce among the States which we here find to exist consists in the possession acquired by the proprietary companies through the

means and with the object we have stated of dominating commerce among the States carried on by other railroads entering or seeking to enter the city of St. Louis and by which such railroads are compelled either to desist from carrying on interstate commerce or to do so upon the terms imposed by the proprietary companies. This control and possession constitutes such a grip upon the commerce of St. Louis and commerce which must cross the river there, whether coming from the east or west as to be both an illegal restraint and an attempt to monopolize.

The power resulting from the combination even before completed by the acquisition of the Wiggins Ferry Company and its related terminals was exhibited when the Rock Island sought an independent entrance.

Some of its abuses are shown by the imposition of the arbitrary hauling charge imposed upon the artificially limited trade districts described. It is shown also by the maintenance of the system of billing traffic destined to cross the river at St. Louis, either east or west, or to St. Louis, if from points on the east side of the river, a practice so galling and universal as to practically "eliminate St. Louis from the railroad map," to quote the graphic, if extravagant, language of counsel for the United States, as respects the great traffic subject to the regulation.

Plainly the combination which has occurred would not be an illegal restraint under the terms of the statute if it were what is claimed for it, a proper terminal association acting as the impartial agent of every line which is under compulsion to use its instrumentalities. If, as we have pointed out, the violation of the statute, in view of the inherent physical conditions, grows out of administrative conditions which may be eliminated and the obvious advantages of unification preserved, such a modification of the agreement between the Terminal Company and the proprietary companies as shall constitute the former the *bona fide* agent and servant of every railroad line which

shall use its facilities, and an inhibition of certain methods of administration to which we have referred, will amply vindicate the wise purpose of the statute, and will preserve to the public a system of great public advantage.

These considerations lead to a reversal of the decree dismissing the bill. This is accordingly adjudged and the case is remanded to the District Court, with directions that a decree be there entered directing the parties to submit to the court, within ninety days after receipt of mandate, a plan for the reorganization of the contract between the fourteen defendant railroad companies and the Terminal Company, which we have pointed out as bringing the combination within the inhibition of the statute.

First. By providing for the admission of any existing or future railroad to joint ownership and control of the combined terminal properties, upon such just and reasonable terms as shall place such applying company upon a plane of equality in respect of benefits and burdens with the present proprietary companies.

Second. Such plan of reorganization must also provide definitely for the use of the terminal facilities by any other railroad not electing to become a joint owner, upon such just and reasonable terms and regulations as will, in respect of use, character and cost of service, place every such company upon as nearly an equal plane as may be with respect to expenses and charges as that occupied by the proprietary companies.

Third. By eliminating from the present agreement between the Terminal Company and the proprietary companies any provision which restricts any such company to the use of the facilities of the Terminal Company.

Fourth. By providing for the complete abolition of the existing practice of billing to East St. Louis, or other junction points, and then rebilling traffic destined to St. Louis, or to points beyond.

Fifth. By providing for the abolition of any special or

so-called arbitrary charge for the use of the terminal facilities in respect of traffic originating within the so-called one hundred mile area, that is not equally and in line manner applied in respect of all other traffic of a like character originating outside of that area.

Sixth. By providing that any disagreement between any company applying to become a joint owner or user as herein provided for and the Terminal or proprietary companies which shall arise after a final decree in this cause, may be submitted to the District Court, upon a petition filed in this cause, subject to review by appeal in the usual manner.

Seventh. To avoid any possible misapprehension, the decree should also contain a provision that nothing therein shall be taken to affect in any wise or at any time the power of the Interstate Commerce Commission over the rates to be charged by the Terminal Company, or the mode of billing traffic passing over its lines, or the establishing of joint through rates or routes over its lines, or any other power conferred by law upon such Commission.

Upon failure of the parties to come to an agreement which is in substantial accord with this opinion and decree, the court will, after hearing the parties upon a plan for the dissolution of the combination between the Terminal Company, The Wiggins Ferry Company, the Merchants' Bridge Company, and the several terminal companies related to the Ferry and Merchants' Bridge Company, make such order and decree for the complete disjoinder of the three systems, and their future operation as independent systems, as may be necessary, enjoining the defendants, singly and collectively from any exercise of control or dominion over either of the said terminal systems, or their related constituent companies, through lease, purchase or stock control, and enjoining the defendants from voting any share in any of said companies or receiving dividends, directly or indirectly, or from any future

combination of the said systems in evasion of such decree or any part thereof.

*Reversed and remanded accordingly.*

Mr. Justice Holmes took no part in the hearing or determination of this case.