**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**TERMINAL RAILROAD ASSOCIATION
OF ST. LOUIS, Defendant-Appellee.**

**No. 16497.**

United States Court of Appeals
Seventh Circuit.

July 2, 1968.

Certiorari Denied Dec. 9, 1968.

See 89 S.Ct. 447.

**FAIRCHILD, Circuit Judge.**

The United States brought actions against Terminal Railroad Association of St. Louis (TRRA) to recover statutory $250 penalties for failure to comply with ICC regulations requiring inspection of power brakes on trains.[1] Judgment was entered for TRRA and the government appeals.

TRRA is a corporation, the stock of which is owned by several railroads serving the St. Louis gateway from the east and by others serving from the west. It owns a bridge over the Mississippi, and trackage and yards on both sides of the river, in St. Louis, Missouri, and East St. Louis, Illinois. It is principally a terminal and interchange facility for other railroads. The railroads which own stock have the right to use its tracks.[2]

The parties agreed to treat each of two train movements as representative of several counts. The circumstances are not in dispute. The issue concerns the applicability of the regulations.

*The New York Central movement.* A train of 60 freight cars, hauled by a New York Central locomotive, and with a New York Central caboose attached, arrived over the New York Central from Indianapolis, at the legal boundary between the New York Central and TRRA tracks in East St. Louis. The New York Central crew left the train, and the TRRA crew boarded. There was no change of locomotive, caboose, or consist. The TRRA crew operated the train over TRRA tracks to Dupo, Illinois, a distance of about nine miles, for delivery to the Missouri Pacific. As far as waybills and accounting records were concerned, the transaction was treated as an interchange directly be-

Joel A. Kunin, Carl W. Feickert, East St. Louis, Ill., J. Thomas Furphy, Dept. of Transportation, Washington, D. C., for plaintiff-appellant.

Norman J. Grundlach, East St. Louis, Ill., George P. Mueller, St. Louis, Mo., for defendant-appellee.

Before CASTLE, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

1. 49 C.F.R. secs. 132.12 and 132.13, adopted pursuant to 45 U.S.C. sec. 9.

2. Descriptions of TRRA at several stages in its long history are found at United States v. Terminal Railroad Association of St. Louis (1911), 224 U.S. 383, 32 S. Ct. 507, 56 L.Ed. 810; United States v. Terminal Railroad Association of St. Louis (1915), 236 U.S. 194, 35 S.Ct. 408, 59 L.Ed. 535; C.R.I. & P. Ry. Co. v. B. & O. R.R. Co. (1926), 113 ICC 681, 685; Manufacturers Ry. Co. v. Ahnapee & W. Ry. Co. (1931), 172 ICC 554, 563; and Laclede Steel Co. v. Louisville & Nashville R. Co. (1937), 222 ICC 321, 324.

tween New York Central and Missouri Pacific.

The government claims that the delivery of the train by the New York Central crew to the TRRA crew was an interchange within the meaning of sec. 132.12 and that TRRA was accordingly required to make the initial terminal road train air brake test. TRRA denies that this delivery constituted an "interchange", and contends no test was required. Clearly none would have been required if the New York Central had remained in control of the train and operated it to Dupo.

*The Missouri Pacific movement.* A train of 123 freight cars, hauled by a Missouri Pacific locomotive, and with a Missouri Pacific caboose attached, arrived, from Little Rock, Arkansas over the Missouri Pacific at the Missouri Pacific yards at Dupo, Illinois. The locomotive and caboose were removed, and a TRRA crew coupled on a TRRA locomotive and caboose. This crew made the type of air brake test required by sec. 132.13(c) (1) "At a point other than initial terminal where locomotive or caboose is changed. * * *" The train proceeded over TRRA tracks a distance of eight miles to a TRRA yard, where the cars were eventually delivered to the B. & O. and Pennsylvania railroads.

The government does not claim that the TRRA received this train in interchange, the alleged difference between this movement and the New York Central movement being the change of locomotive and caboose. It claims that this movement was a transfer train movement, making sec. 132.13(e) (1) applicable, and that since the movement did not exceed 20 miles the initial terminal road train air brake test, pursuant to sec. 132.13(e) (2), was not required, but the test prescribed by sec. 132.13(e) (1) was. One of the differences between the (c) (1) test, actually performed, and the (e) (1) test is that in (c) (1) observation of the application and release of brakes on the rear car would suffice, while in (e) (1) it would be necessary to "walk the train" observing application on each car. The latter observation is one of the requirements of the initial terminal test, required for transfer train movements exceeding 20 miles and for trains received in interchange.

TRRA denies this was a transfer train movement. Had the Missouri Pacific crew remained in control, changed engine and caboose, and operated the train to the TRRA yard, the only test required would have been the one prescribed by sec. 132.13(c) (1), and it is conceded this test was made. TRRA contends it was required to do no more.

As to each movement TRRA appears to take the position that for the purpose of air brake inspection requirements the movement by TRRA is to be treated as if performed by New York Central or Missouri Pacific, respectively. It emphasizes its character as a terminal and interchange facility, operating over short distances and at low speeds, and in many respects having an agency relationship with connecting carriers. The government emphasizes TRRA's legal status as a distinct entity and a common carrier.

TRRA concedes that being a terminal or belt line carrier, or being in an agency status, does not protect it from liability for violation of the safety appliance acts or power brake rules.[3] But it does appear to claim that its status should produce a construction of the rules on inspection so that its duty with respect to the train movements in this case would be the same as the originating carriers' duty if they had performed the movements.

We see no reason for this special approach to construction in the case of inspection requirements. Other provisions of the statutes tend to prevent

---

**3.** See United States v. Indiana Harbor Belt Railroad Company (N.D.Ind., 1963), 224 F.Supp. 219, 222; United States v. Houston Belt & Ter. Ry. Co. (5th Cir. 1954), 210 F.2d 421, 425.

the use of defective equipment, or use in an improper manner, by making the carrier in immediate control liable for penalty for such use. Any one inspection may not disclose a defective item, but compelling inspections before use will tend to disclose and prevent the use of equipment which does not function properly. Treating each carrier which handles a train movement independently, and compelling it to inspect for itself rather than rely on an inspection by a previous carrier is a reasonable means of promoting safety, and appears to be intended by the regulations.

49 C.F.R. sec. 132.12 is entitled "Initial terminal road train air brake tests." Paragraphs (a) to (h) describe the inspection and testing procedures and standards. The opening paragraph provides that this inspection and test must be given "at points: (1) Where a train is originally made up (Initial Terminal); (2) Where train consist is changed other than by adding or removing a solid block of cars and train brake system remains charged; (3) Where train is received in interchange." Sec. 132.13 (e) (2) requires the same inspection and test for "transfer train and yard train movements exceeding 20 miles." As previously noted, sec. 132.13(e) (1) prescribes a less rigorous test for "transfer train and yard train movements not exceeding 20 miles."

■ The structure of the opening paragraph of sec. 132.12 strongly suggests an intention that each road train in the possession of any carrier must be given the initial terminal test at the first moment that the train is operated under the control of that particular carrier, i. e., when made up, when radically changed in consist, or when received intact from another carrier. The same test is required for a transfer train operated more than 20 miles, and if there is any exception to the symmetrical plan, it is the transfer train which moves 20 miles or less.

This intention was emphasized by the Interstate Commerce Commission in a declaratory ruling filed with the Federal Register March 26, 1965,[4] about six months before the train movements involved in this case. Several railroads petitioned for an answer to the following question, among others, and received the following answer:

"Question: When two railroads join in through train operation without change of power, caboose, or other train consist at their boundary, changing only crews at said boundary, is the boundary the place where the train is received in interchange under 49 CFR 132.12?

"Answer: The boundary between carriers is the place where the train is received in interchange under 49 CFR 132.12 because at that point the use or haul on the line of railroad of the other carrier commences."

In an answer to another question, the commission said:

"＊ ＊ ＊ The clear intent and purpose of 49 CFR 132.12 is to assure full compliance with the power brake requirements of the Safety Appliance Acts. It requires each railroad to discover and repair or reject cars received from other carriers in defective condition, since a carrier may not lawfully haul or use a car with a defective safety appliance, including power brakes, on its line of railroad when the defect had occurred on the line of another carrier."

■ We conclude that the regulations must be read upon the premise that TRRA is independently responsible for compliance with safety requirements by trains which are on its line and under its control. It is not entitled to treat the movement of those trains as if they had remained in the control of New York Central and Missouri Pacific, and, in effect, to rely upon the initial terminal tests made by those carriers. As will appear, we also conclude that in each instance TRRA was required to

make the type of test required by sec. 132.13(e) (1). It did not do so, and became liable for the statutory penalty on each of the counts of which these train movements were representative.

The government contends that the New York Central movement involved a train received in interchange by TRRA, and that an initial terminal test was required by sec. 132.12. There are two reasons why we do not agree:

(1) The government gives no satisfactory explanation why different provisions apply to the New York Central movement and the Missouri Pacific movement. In both instances a through train had been hauled by the previous carrier. Both were to be hauled less than 20 miles by TRRA. The only difference relied on by the government was that the locomotive and caboose had been changed on the Missouri Pacific movement. If this difference made this train a transfer train and the New York Central a train received in interchange, the regulations achieve an absurd result: A train coming onto the carrier's line intact, with locomotive and caboose, requires a more rigorous test than one on which the locomotive and caboose are changed, though both move less than 20 miles.

▮ (2) TRRA has demonstrated that "interchange" has a special meaning in the railroad industry and that the history of the power brake rules gives sound reason why the word must be construed according to its railroad meaning.

The statutory authority for secs. 132.12 and 132.13 is 45 U.S.C. sec. 9. As amended in 1958, the statute provides that the commission shall adopt the rules of the Association of American Railroads for the inspection (among other things) of railroad power or train brakes. The so-called Power Brake

Rules of A.A.R. were adopted as 49 CFR, secs. 132.10 through .17.

Rule 7 of the association's Car Service Rules provided: "Cars shall be considered as having been delivered to a connecting railroad when placed upon the track agreed upon and designated as the interchange track for such deliveries, accompanied or preceded by necessary data for forwarding and to insure delivery, and accepted by the car inspector of the receiving road. * * * " [5] On the basis of Rule 7, it has been said, "Interchange occurs when a car passes from the account of one railroad into the account of another." [6]

▮ Of course, reflection in accounting records and the transfer of documents which seem to be essential to completion of an interchange under the railroad usage of the term, are not germane, ordinarily, to consideration of physical safety, with which the power brake rules are concerned. There is ambiguity, however, and we think that the soundest construction is that a train which is physically delivered by one carrier to a terminal or belt line carrier, but not treated for accounting purposes as interchanged between the two, is to be deemed a transfer train, for the purposes of sec. 132.13 and given the (e) (1) test if the movement by the terminal or belt line carrier does not exceed 20 miles, and the (e) (2) (initial terminal) test if it does. In so doing we read the provisions of secs. 132.12 and 132.13 together, give effect to the government's position that sec. 132.12 does not cover all inter line movements, but sec. 132.13(e) covers some of them, and recognize the concept that in situations like the New York Central movement the interchange, in the railroad sense, is between the trunk line carriers.

The judgment is reversed and the cause remanded with directions to enter judgment for plaintiff, consistent with this opinion.

5. Quoted in Chicago & North Western Ry. Co. v. Chicago, R.I. & P.R. Co. (N.D. Iowa, 1959), 179 F.Supp. 33, 40.

6. Southern Railway Co. v. Louisville and Nashville R. Co. (W.D.Ky.1960), 185 F. Supp. 645, 651, aff'd (6th Cir. 1961), 289 F.2d 934.