**CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a corporation, Plaintiff and Counterdefendant,**

v.

**PEORIA AND PEKIN UNION RAILWAY COMPANY, Defendant and Counterclaimant,**

and

**Illinois Central Railroad Company, a corporation; Peoria and Eastern Railway Company, a corporation; the New York, Chicago and St. Louis Railroad Company, a corporation; Chicago & Illinois Midland Railway Company, a corporation; and the Pennsylvania Railroad Company, a corporation, Defendants,**

**United States Trust Company of New York, as Trustee of Peoria and Pekin Union Railway Company First Mortgage dated January 1, 1950, Intervener Defendant and Counterclaimant.**

**Civ. A. No. P-2033.**

United States District Court
S. D. Illinois, N. D.

Jan. 8, 1962.

John E. Cassidy, Peoria, Ill., Carl McGowan, Edgar Vanneman, Jr., John C. Danielson, Chicago, Ill., for plaintiff.

Eugene R. Johnson, Donald G. Beste, Miller, Westervelt & Johnson, Peoria, Ill., for defendant Peoria & Pekin Union R. Co.

Eugene R. Johnson, Donald G. Beste, Peoria, Ill., Herbert J. Deany, General Atty., Chicago, Ill., for defendant Illinois Cent. R. Co.

John M. Elliott, Peoria, Ill., Marvin A. Jersild, General Atty., New York Cent. R. R. System, Chicago, Ill., for defendant Peoria & Eastern R. Co.

Robert Broderick, Pope & Driemeyer, East St. Louis, Ill., Thomas O. Broker, Kemper A. Dobbins, Cleveland, Ohio, for defendant New York, Chicago & St. Louis R. Co.

John M. Elliott, Peoria, Ill., for defendant Chicago & Ill. Midland R. Co.

Edward R. Gustafson, Chicago, Ill., for defendant Pennsylvania R. Co.

Wilson & McIlvaine, Chicago, Ill., William J. Voelker, Jr., Heyl, Royster & Voelker, Peoria, Ill., for intervener de-

fendant and counterclaimant, United States Trust Co. of New York, as trustee, etc.

MERCER, Chief Judge.

This suit, instituted by plaintiff, Chicago and North Western Railway Company, against Peoria and Pekin Union Railway Company and other railroads, prays relief by declaratory judgment. Plaintiff has now moved for summary judgment in its favor upon its complaint, as amended. The nature of the case and the scope of plaintiff's position that it is entitled to summary judgment necessitates a rather thorough summary of the pleadings.

The complaint, as amended named as defendants, in addition to the Peoria and Pekin Union, Illinois Central Railroad Company, Peoria and Eastern Railway Company, the New York, Chicago & St. Louis Railroad Company, Chicago & Illinois Midland Railway Company, and The Pennsylvania Railroad Company. Upon leave of court first had, the United States Trust Company of New York, as Trustee of Peoria & Pekin Union Railway Company First Mortgage dated January 1, 1950, intervened as a defendant. Hereinafter, for convenience, the parties are referred to as plaintiff (sometimes C. & N. W.), P. & P. U., I. C., Nickle Plate, P & E., C. & I. M., Penn., and intervener. In the course of the summary and analysis of the pleadings reference will be made to the Toledo, Peoria & Western Railroad Company, Minneapolis & St. Louis Railway Company, The Peoria Terminal Company, Chicago, Rock Island and Pacific Railroad Company and Gulf, Mobile and Ohio Railroad Company, which, respectively, are hereinafter referred to as T. P. & W., M. & St. L. Terminal, Rock Island and G. M. & O.

P. & P. U. is a corporation, the stock of which is owned by plaintiff, C. & I. M., P. & E., Nickle Plate, Penn. and the Mississippi Valley Corporation, a wholly owned subsidiary of I. C. The board of directors of P. & P. U. consists of the principal officers of all owner railroads, who act in their official capacity as representatives of their respective railroads.

Historically, P. & P. U. was organized by certain proprietary railroad lines to handle terminal and switching traffic in the City of Peoria, Illinois. The rights and obligations of those proprietary lines and P. & P. U. relating, inter alia, to the transfer, switching or handling of freight cars coming into or going out of, or through the City of Peoria, were defined by a contract dated February 1, 1881. That contract is still in effect and has been extended for a term to February 1, 1981. I. C., P. & E., Nickle Plate, C. & I. M. and Penn. are successors in interest to the original proprietary lines and to the rights and obligations under the 1881 contract.

On December 1, 1911, plaintiff entered into a contract with P. & P. U. whereby it was agreed, among other things, that P. & P. U. would handle the transfer and switching of all cars of plaintiff coming into or going out of or through the City of Peoria at a uniform rate per car. That contract has been extended to February 1, 1981, and is the subject matter of the present suit.

Jurisdiction of the court is invoked in the cause upon diversity of citizenship, the claim involved exceeding the jurisdictional amount of $10,000.00.

With relationship to Peoria, plaintiff is a north-south trunk line railroad, operating over its line extending from Chicago to St. Louis, Missouri. Its main line passes westerly of the Peoria City limits, transversing, among others, places in the Peoria area known as Kickapoo Junction, Sommer and Hollis.[1]

T. P. & W. is an east-west trunk line railroad, operating over its main line which, with trackage rights granted by other railroads, extends from Effnor, on the Illinois-Indiana State Line, through Peoria, to its western terminus at Lomax, Illinois, and Keokuk, Iowa. Its line

---

1. Unless otherwise indicated, all cities, towns and places mentioned in this opinion are located in the State of Illinois.

intersects the main line of plaintiff at or near Hollis.

Prior to March 6, 1957, plaintiff and T. P. & W. constructed a new track connection between their respective lines at Sommer, located several hundred feet south of Hollis, designed to permit the direct interchange of freight between the two lines.[2] On March 6, 1957, direct interchange of freight between plaintiff and T. P. & W. was commenced at Sommer, a practice which has since continued, with the exception of one interruption not here material. Plaintiff and T. P. & W. sought, and obtained, approval of construction of the connecting line and of the arrangement for direct interchange of traffic, with exceptions not here material, from the Interstate Commerce Commission. F.D. No. 19922.

Sommer is in the Peoria vicinity, located southwesterly from and outside the corporate limits of the latter city. By use of the Sommer connection with T. P. & W., plaintiff has interchanged and now interchanges directly with the T. P. & W. substantial amounts of freight of a type which had, prior to March 6, 1957, been handled by the P. & P. U. within Peoria under the terms of the 1911 agreement, as extended. Therein lies the crux of the dispute which gave rise to the initial complaint.

After the direct interchange between plaintiff and T. P. & W. began, P. & P. U. took the position that that interchange was a violation of plaintiff's obligations under the 1911 contract, claiming the right under the contract to handle all C. & N. W. freight traffic destined for interchange in the Peoria vicinity to or from other railroads and all freight moving between plaintiff's line and consignees or shippers in the area served by

P. & P. U. P. & P. U. demanded from plaintiff an accounting under the contract with respect to all freight interchanged directly with T. P. & W., and the payment to P. & P. U. by plaintiff of the contract rate for all cars so interchanged which, in the absence of the direct interchange connection at Sommer, P. & P. U. would have handled.

Prior to, and at the inception of this suit plaintiff took the position that the 1911 contract, as extended, would not preclude the direct interchange arrangement with the T. P. & W. and that plaintiff's operations in that respect did not constitute a violation of its contract with P. & P. U. Further, plaintiff alleged in its complaint that public benefit, added service efficiency and operating economy are derived from plaintiff's direct interchange connection with T. P. & W., which would be disrupted and destroyed if the claim of P. & P. U. were substantiated.

The complaint prayed a declaratory adjudication of the controversy which thus existed, and a judgment that the direct interchange connection between plaintiff and T. P. & W. at Sommer does not constitute a violation of the terms and provisions of the 1911 contract.[3]

P. & P. U. answered the complaint and filed a counterclaim for injunctive relief and an accounting. Answers were filed by the other defendants.

Thereafter, on May 22, 1961, pursuant to leave of court, plaintiff filed an amendment to its complaint.

In its amended complaint, in addition to the allegations above summarized, plaintiff alleged that neither the 1911 contract nor the extension of that contract have been approved by the I. C.C. under Section 5(1) of the Interstate Commerce Act;[4] that the supplemental

---

2. The arrangement between plaintiff and T. P. & W. included an agreement for the joint use by each railroad of the tracks of the other in, and in the vicinity of, an industrial area located near Hollis.

3. With the exception of statements relating to the geographical location of the lines of C. & N. W. and T. P. & W., all fact statements above are in summary of

the allegations of the original complaint. As I subsequently relate, plaintiff, for the purpose of its pending motion for summary judgment, concedes that the 1911 contract does encompass, and would preclude, its direct interchange of traffic at Sommer.

4. 49 U.S.C.A. § 5(1).

agreement between plaintiff and P. & P. U. extending the contract to February 1, 1981, had been approved by the I.C.C. under Section 5(2) of the Act,[5] under Finance Docket No. 15354, and no appeal was taken from the I.C.C. decision; that plaintiff, with I.C.C. approval, acquired the M. & St. L. on October 31, 1960, a railroad with which the tracks of P. & P. U. connect within the City of Peoria; that the M. & St. L. is now operated by plaintiff as a division of its railroad; that the M. & St. L. had for many years prior to October 31, 1960, interchanged traffic directly with T. P. & W., and with other railroads within Peoria, and that plaintiff, on its M. & St. L. division, has continued that interchange practice since the last-mentioned date; that the I.C.C. found in F.D. No. 19922, in which the Sommer interchange connection was approved, that P. & P. U. was unable to provide as efficient and economical service on certain traffic as is possible with the direct interchange between plaintiff and the T. P. & W.; and that no appeal was taken by anyone from the I.C.C. decision in F.D. No. 19922.

In its amendment to the complaint, plaintiff prays judgment that that part of the 1911 contract, as extended, which purports to grant to P. & P. U. exclusive rights to perform terminal services on, and to transfer, switch and handle all of plaintiff's cars destined to or from industries in Peoria and to switch or transfer all of plaintiff's cars destined for interchange to or from railroads other than the P. & P. U. in the Peoria vicinity constitutes a pooling arrangement within the meaning of Section 5(1) of the Act which has not been approved by the I.C.C. and is therefore, unenforcible as a violation of that Section and of the antitrust laws. 15 U.S.C.A. §§ 1, 2. Plaintiff further prays judgment that the portion of the 1911 contract, as extended, which purports to reserve to P.

& P. U. all freight and passenger business originating at points on the line of P. & P. U. and which permits P. & P. U. to fix the rates to be charged on such traffic for companies using P. & P. U. tracks constitutes a pooling agreement and a contract in restraint of trade within the meaning of Section 5(1) and Section 1 and 2 of the Sherman Act. 15 U.S.C.A. §§ 1, 2. Finally, it is prayed, by the amendment to the complaint, that the court enjoin P. & P. U. from enforcing, or attempting to enforce, those provisions of the 1911 contract, as extended.

By its answer to the complaint, as amended, P. & P. U. admits the allegation of historical facts, the factual basis for its corporate existence, the ownership of its stock and the makeup of its directorship as alleged in the complaint, the substantial similarity of the contracts in existence relating to operation of its proprietary lines and tenant lines,[6] the existence of an actual controversy and the existence of diversity of citizenship.

Further answering the complaint as amended, P. & P. U. avers that the 1911 contract, as extended, also defines rights and duties between plaintiff and P. & P. U. relating to the transfer, switching or handling by P. & P. U. of all cars of plaintiff coming into, out of or through Peoria and to the transfer, switching and handling of all of plaintiff's cars in and near the City of Peoria, intended for transfer to all freight houses, warehouses, industries and to and from the tracks and yards of other railroads with which the tracks of P. & P. U. are connected. It further avers that the contract reserves to P. & P. U. all local freight business between the cities of Peoria and Pekin, and all intermediate points. P. & P. U. avers that the meaning, intent and effect of the contract was and is to vest P. & P. U. with the exclusive right to make up, break up and make

5. 49 U.S.C.A. § 5(2).

6. In addition to the 1881 contract and the 1911 contract with plaintiff, P. & P. U. has an operating agreement with G. M. & O. The latter railroad is not a proprietary line. Plaintiff, I. C., P. & E., Nickle Plate, C. & I. M., Penn. and G. M. & O., all fall within the generic classification of P. & P. U. tenant lines.

transfers of all cars, both loaded and empty, consigned to or from plaintiff in the Peoria vicinity, and that the contract requires that all freight cars of plaintiff coming into, out of or through Peoria be delivered by plaintiff to P. & P. U. to be transferred, switched or handled. Finally, P. & P. U. avers that the contract requires that all of plaintiff's freight trains moving to or from Peoria shall pass over P. & P. U.'s track in accordance with the terms of the agreement.

Under its contract with plaintiff and the proprietary and tenant lines, P. & P. U. avers an exclusive right to the entire local rail traffic between Peoria and Pekin and intermediate points; to make transfers, switch and handle all cars consigned to or from any party to the several contracts; to transfer, switch and handle all cars consigned to or from all locations to which the tracks of P. & P. U. extend and to handle all cars moving between all points on P. & P. U. lines; to have all cars of the other contracting parties coming into, out of or through Peoria delivered to P. & P. U. to be by it transferred, switched or handled; and to have all freight trains of the other contracting parties moving to or from Peoria pass over P. & P. U. tracks.

With respect to the direct interchange between plaintiff and T. P. & W., P. & P. U. admits the establishment of the direct interchange connection at Sommer; the geographical location of Sommer outside the corporate limits of Peoria; and that plaintiff and T. P. & W. have, since the establishment of the Sommer connection, and now do, directly interchange freight traffic of a type which plaintiff formerly handled within the City of Peoria by utilizing the services of P. & P. U.

With respect to the M. & St. L. phase of the case, P. & P. U. admits that for many years prior to October 31, 1961, M. & St. L. had interchanged traffic directly with the T. P. & W. and other railroads within Peoria; that plaintiff, with I.C.C. approval, purchased the M. & St. L on the latter date and now operates that line as a C. & N. W. division; and that plaintiff on its M. & St. L. division has continued to direct interchange of traffic with railroads other than P. & P. U. within Peoria.

As to the I.C.C. proceedings, P. & P. U. admits that extension of the 1911 agreement was approved by the I.C.C. under Section 5(2) of the Act in F.D. No. 15354, and that no appeal was taken from that decision. It avers however, that the I.C.C. order constituted a ratification and approval of the agreement. It denies that the I.C.C. in F.D. No. 19922 found that the P. & P. U. is unable to provide service as efficiently on traffic interchanged between plaintiff and T. P. & W. or that switching of that interchange traffic by P. & P. U. would involve wasteful and unnecessary transportation. It admits that no appeal was taken by anyone from the decision in F.D. No. 19922, but it denied that the I.C.C. decision has any bearing upon the present controversy.

In support of the same premise, P. & P. U. denies that the public has any interest in the controversy and that there has been or will be any public benefits derived from the direct interchange of traffic between plaintiff and T. P. & W. at Sommer. Alternatively, P. & P. U. avers that any public interest in the controversy, arising out of any public benefits which might arise from the Sommer interchange, is slight and subordinate to the rights of P. & P. U. under its contract with plaintiff. Finally, by way of defense, P. & P. U. denies that the exclusive terminal and switching rights given to it by the 1911 contract constitutes a pooling agreement within the meaning of Section 5(1) of the Act, or that such provisions are unenforcible as a violation of the antitrust laws.

By its amended counterclaim, P. & P. U. alleges that the direct interchange of freight between plaintiff and T. P. & W. at Sommer is a violation of the 1911 agreement for which P. & P. U. is entitled to damages. It further alleges that plaintiff's operation of the M. & St. L. since October 31, 1960, has diverted traffic from P. & P. U. by: a. trans-

porting cars and trains over P. & P. U. tracks from plaintiff's Adams Street Yard to and from the Bartlett Yards of the M. & St. L.; b. by making direct interchange of cars on the M. & St. L. division with the Rock Island and accepting direct interchange of cars from Rock Island and accepting direct interchange of cars from Rock Island at the Bartlett Yards; c. by making direct interchange of cars with and accepting interchange of cars from Terminal at the Bartlett Yards; d. by making direct interchanges of bridge traffic moving south on the M. & St. L., for east and west destinations, with the T. P. & W. which is alleged to be a violation of the contract and contrary to the order of the I.C.C. in F.D. No. 19922; e. by making direct interchange within Peoria with the T. P. & W. at the Iowa Junction connection of the T. P. & W. with the M. & St. L.; f. by plaintiff's continuation of use of the M. & St. L. freight house at the Bartlett Yards; and g. in other ways, unknown to P. & P. U. by use of the M. & St. L. Bartlett Yard and by means of connections of plaintiff's M. & St. L. division with other railroads and industries in the Peoria-Pekin area.

By its counterclaim, P. & P. U. prays judgment requiring plaintiff to produce books and records of its operation and account as to all aspects of business handled by plaintiff by direct interchange with the T. P. & W. at Sommer since March 6, 1957, as to all other direct interchanges with other carriers and as to all aspects of its operations through and by means of the track connections and facilities of plaintiff's M. & St. L. division, subsequent to October 31, 1960, for an accounting as to revenues allegedly lost by P. & P. U. by reason of such operations by plaintiff. It prays a judgment for damages as determined by means of such accounting and enjoining plaintiff from further violation of the 1911 contract, as extended.

The answer of the intervener parallels the averments of the answer of P. & P. U., averring that P. & P. U. has the exclusive right to handle the traffic which plaintiff now interchanges directly with T. P. & W. at Sommer and the traffic which plaintiff now interchanges directly with T. P. & W. and other railroads by operation of its M. & St. L. division since October 31, 1960. It prays that the court will sustain the 1911 contract as extended, as a valid, binding and subsisting agreement and that plaintiff's direct interchange operations at Sommer and all other interchange operations which violate the contract be enjoined.

By its counterclaim the intervener alleges that it is trustee of an issue of $2,500,000.00 of first mortgage bonds executed and delivered to it by the P. & P. U. dated January 1, 1950, upon an indebtedness incurred pursuant to authorization by the I.C.C., that the P. & P. U. board of directors, including in its number an executive officer of plaintiff, authorized the execution of that mortgage and the conveyance, among other things, of all right, title and interest in all operating agreements between P. & P. U. and other railroads, including the 1911 agreement with plaintiff, as security for the mortgage; that the mortgage contains a provision, inter alia, that P. & P. U. would not, by agreement or otherwise, amend or modify the operating agreements to which reference has hereinabove been made, or any like agreements with other railroads, in such manner as to effect a reduction in the fixed amount payable annually pursuant to the terms of such agreements, it is then alleged that plaintiff, by its establishment of the Sommer connection with T. P. & W., and its operations of its M. & St. L. division has failed and refused to comply with the terms and conditions of its contract without just cause and without legal excuse.

It prays judgment that plaintiff has no right as against intervener to alter or fail to perform its 1911 contract and that plaintiff be enjoined from further violation thereof.

The other defendants have answered the complaint, as amended, each taking a

position substantially supporting that of the P. & P. U. answer.

The record before the court upon this motion consists of the amended complaint, the amended answer and counterclaim of P. & P. U., the amended answer and counterclaim of intervener, the answers, or amended answers, of other defendants, admissions and answers to interrogatories by P. & P. U., and certain reports of statistics released by and tariffs filed with the I.C.C.

P. & P. U. operates approximately 147 miles of railroad, including industrial and switch tracks. Its lines extend from Pekin, on the East side of the Illinois River to yards of plaintiff, which P. & P. U. operates for plaintiff, to a termination point of its line in the vicinity of Hollis. Its tracks connect with the tracks of 14 railroads serving the Peoria-Pekin area, namely, C. & N. W., M. & St. L. Div. of C. & N. W., I. C., P. & E., Nickle Plate, C. & I. M., Penn., T. P. & W., G. M. & O., Rock Island, Terminal, I. T.[7] Santa Fe,[8] and the C. B. & Q.[9] The tracks of P. & P. U. connect with and P. & P. U. serves approximately 123 industries in the area exclusively, and indirectly or jointly with other carriers, an additional 197 industries.

From its main line, C. & N. W. enters Peoria over tracks extending from a point known as Kickapoo Junction to its Adams Street Yard, which is operated by P. & P. U. Prior to establishment of the Sommer connection with T. P. & W., plaintiff delivered all traffic for interchange with T. P. & W. to P. & P. U. at Adams Street. From Adams Street, such traffic was moved over P. & P. U. lines southward and eastward to the East Peoria Yards of the T. P. & W. A converse movement was employed for traffic destined for a north or south movement over C. & N. W. moving in interchange from the T. P. & W.

As far as the M. & St. L. phase of the controversy is concerned, plaintiff, in operating that line as a division of its line, has continued the established practice of the M. & St. L. of interchanging directly with T. P. & W. Rock Island and other roads freight traffic at Bartlett Yards and Iowa Junction.

With that factual background, the positions of the respective parties may be more precisely delineated.

The position of P. & P. U., in short, is that the 1911 contract vests in it an exclusive right to make up and break up C. & N. W. trains moving to, out of or through Peoria and vicinity. It asserts that that right includes the right to handle all cars destined to or from consignees or shippers within the area or destined for interchange with all other railroads with which the lines of P. & P. U. connect. It claims the right, additionally, to fix the rates to be charged for all freight moving to or from industries, shippers and consignees of freight which are served by its lines.

The P. & P. U. position with respect to M. & St. L. is that plaintiff was obligated under provision of the 1911 contract, as extended, to enter into a similar exclusive agreement with P. & P. U. for the handling, switching and interchange of M. & St. L. traffic.

Thus, the distinction between the Sommer phase and the M. & St. L. phase of the controversy is a factual one, not material to disposition of this motion. In each instance, though the factual basis be different, P. & P. U. claims a breach by plaintiff of the contract by its actions which deny to P. & P. U. the exclusive right to switch, handle and interchange the cars involved.

For purposes of its motion for summary judgment, plaintiff concedes that its Sommer operation is within the purview of the 1911 contract, as extended. Similarly, upon the M. & St. L. phase, the pending issues must be approached from the basis of a concession that the

7. Illinois Terminal Railroad Company.

8. Atchison, Topeka and Santa Fe Railway Company.

9. Chicago, Burlington and Quincy Railroad Company.

contract also proscribes plaintiff, through its operation of the M. & St. L., from entering into Peoria, and there handling and switching cars destined for terminal delivery or interchange with other railroads without the services of P. & P. U. The concession on the latter point is not clearly expressed, but, inherently, the motion for summary judgment, as framed, includes that concession.

Plaintiff's position is that it will honor the obligations of its contract and employ the services of P. & P. U. for the interchange of all traffic consistent with its needs and in all instances in which it has no facilities for direct interchange. It contends, however, that, as a matter of admitted fact, plaintiff and P. & P. U. are competitors in those areas in which plaintiff's lines are directly connected with other railroads, as, for example, at Sommer on its main line and at Bartlett Yard and Iowa Junction where the lines of its M. & St. L. division connect directly with the lines of T. P. & W., Rock Island and other roads.

Plaintiff's position is finalized in the predicative basis for its motion for summary judgment, namely, that the 1911 contract constitutes a pooling of railroad services which has not been approved by the I.C.C. under Section 5(1) and which, for want of I.C.C. approval, is a violation of the Interstate Commerce Act and an unlawful restraint of competition prohibited by the antitrust laws. In its motion, plaintiff prays a summary judgment holding invalid and unenforcible, and enjoining P. & P. U. from attempting to enforce, all provisions of the 1911 contract which purport to reserve to P. & P. U. the right to handle all switching and transfer of C. & N. W. freight traffic at Peoria and vicinity, to reserve to P. & P. U. all traffic originating at points served by P. & P. U.'s lines and to require plaintiff to serve industries located at such points only at rates prescribed by P. & P. U.[10]

10. The provisions involved are paragraphs Fourth, AA and FF of the 1911 contract. Those paragraphs provide, in pertinent part:

"Fourth: [P. & P. U.] shall receive on its tracks and terminal facilities in and near the City of Peoria, all loaded and empty freight and other cars of the lessee intended for transfer by the [P. & P. U.] from and to all freight houses, warehouses, packing houses, stock yards, grain elevators, distilleries, mills and other industries, and to and from the tracks and warehouses of other railroads with any of which the tracks of the said [P. & P. U.] shall at any time be connected, * * *; and subject to the conditions, reservations and payments hereinafter mentioned and provided for, the said [P. & P. U.] to which is expressly reserved the right to make any and all such transfers, doth hereby covenant and agree promptly and efficiently * * *, to make such transfers of the loaded and empty freight and other cars of the said lessee, * * *."

"AA * * *. And all of the loaded and empty freight cars of the said lessee coming into or going out or through said City of Peoria, shall be delivered to the said [P. & P. U.] to be transferred, switched or handled by it for said lessee;

and all of the freight or passenger trains of the said lessee moving to or from Peoria, shall pass over the tracks of said [P. & P. U.]"

"FF * * *; but [P. & P. U.] hereby reserves to itself the entire local freight and passenger business between the termini of its said main tracks and their connection of the same with the tracks of the said lessee as above provided, and between all other points on its line of railroad, and also reserves all freight and passenger business that may originate at any point or station on its line of road and be carried to any other point or station on its line of road there to be delivered to some other carrier or Company, for further carriage; said lessee shall not participate therein, except upon such terms as shall be extended to it, * * *, and upon a schedule of rates therefor to be prescribed by said [P. & P. U.] and to be observed by all Companies using said track; and should said lessee fail to comply with such schedule, either by rebates or otherwise, such lessee may be altogether excluded from participating in such traffic so reserved by said [P. & P. U.] And said lessee hereby further covenants and agrees that it will account for and pay over monthly, at the time and place of their monthly payments, to the [P. &

After a thorough analysis of the record before the court, I am convinced that the case is an appropriate one for summary judgment because no genuine issue as to any material fact remains for decision.

It is true that factual issues in two general areas are spelled out in the joint brief of P. & P. U. and intervener, but those issues are contingent upon disposition of the pending motion. As I have pointed out above, for purposes of this motion plaintiff concedes and must concede, that its Sommer interchange operations and its M. & St. L. direct interchange operations are conducted in violation of the contract. Thus, there is removed from the case in its present posture any question of fact which might arise in that area. The second general area of asserted factual issues relates to the measure of P. & P. U.'s damages upon an accounting. In that respect, the counterclaims contain no allegation that plaintiff has failed to pay P. & P. U. for any service rendered. The claim is that P. & P. U. is entitled to an accounting and compensation under the contract for traffic interchanged by plaintiff with other roads in violation of the exclusive service provisions of the 1911 contract. Thus, the issues raised by the counterclaim are not now before the court, and such issues will become material to decision of the case only if the pending motion is denied and the case proceeds to trial.

At the outset, I had the impression that the question of the competitive positions of plaintiff and P. & P. U. presented a genuine issue of material fact. That impression followed P. & P. U.'s contention that it is a terminal road serving the Peoria gateway and that it does no line-haul business, while C. & N. W. is a line-haul road serving areas northward and southward from Peoria. Thus, P. & P. U. insists that plaintiff and P. & P. U. are end to end roads, complementary to each other and in no real sense competitive.

The first impression was dispelled, however, by an analysis of the pleading in the light of realization that the first impression stemmed from a generalization of the respective functions of P. & P. U. and C. & N. W. Upon what we may characterize as plaintiff's bread and butter business, the line-haul movement of freight, P. & P. U., as a terminal road operating in the Peoria gateway, is not a competitor of C. & N. W. But the generalization does not apply to terminal service at the gateway because plaintiff's line does not terminate at Peoria. Peoria, on the contrary, is an intermediate point upon a through line from Chicago to St. Louis. The pleadings admit of no doubt that C. & N. W. and P. & P. U. have been potentially competitive in a limited area at all times material to this controversy. Wherever, in the Peoria vicinity, the line of C. & N. W. intersects the lines of other trunk line railroads the direct interchange of traffic between plaintiff and such roads constituted an available alternative to plaintiff's use of P. & P. U.'s services. In fact, prior to March 6, 1957, plaintiff elected to deliver all traffic for local delivery and interchange to P. & P. U. and the potential competition between the two roads remained dormant. With the construction of 519.8 feet connecting track by T. P. & W., plaintiff's dormant competitive position at Hollis and Sommer was converted on that date to actual competition with P. & P. U., with respect to traffic which plaintiff could interchange directly with T. P. & W.

P. & P. U. by its answer, admits that plaintiff does now actively compete with it in that respect. In its counterclaim, P. & P. U. alleges that self-same competition by plaintiff as a violation of plaintiff's undertakings under the provisions of the 1911 contract.

P. U.] all sums collected by it, for or on account of such freight or passenger business above reserved by the [P. &

P. U.] in excess of the portion thereof which said [P. & P. U.] may allow it for the service."

With relationship to competition between P. & P. U. and M. & St. L., P. &. P. U. admits by its answer that M. & St. L. for a number of years has conducted direct interchange in Peoria with T. P. & W., Rock Island and other roads in competition with services offered by P. & P. U. It further admits that plaintiff, operating M. & St. L. as a division of C. & N. W., has continued that same competition, and, by its counterclaim, P. & P. U. alleges that plaintiff's continuation thereof is a violation of plaintiff's agreement.

Unquestionably, upon the pleadings alone and undisputed geographic facts, plaintiff and P. & P. U. are, in fact, competitors in those limited areas where plaintiff has direct access to the lines of other trunk line railroads. In a larger area, which is immaterial to this cause, plaintiff and P. & P. U. are end to end roads and not competitors. For example, the two are complementary roads with respect to traffic destined for interchange to and from a majority of the trunk line railroads serving the Peoria area, with whose lines plaintiff has no connection, and with respect to industries served by P. & P. U. which are not also served directly by plaintiff, T. P. & W. or plaintiff's M. & St. L. division.

Upon admitted facts, I find that plaintiff and P. & P. U. do compete for the terminal service market in Peoria and the Peoria vicinity in the areas above indicated. Under concessions made by plaintiff for the purpose of this motion, plaintiff's competition in that respect infringes upon rights reserved to P. & P. U. by the 1911 contract. If references need be made to the contract at all in view of that concession, suffice it to note that paragraph Fourth expressly reserves to P. & P. U. the right to make "any and all" transfers of C. & N. W. cars to and from industries and to and from railroads which are served by P. & P. U., paragraph AA requires that all "loaded and empty freight cars" of C. & N. W. "coming into or going out of or through" Peoria be delivered to P. & P. U. "to be transferred, switched or handled by it" and paragraph FF reserves to P. & P. U. "the entire local freight and passenger business between the termini of its" main tracks and the "connection of the same with the tracks of" C. & N. W., "between all other points on" P. & P. U.'s line of railroad and "all freight and passenger business that may originate at any point or station on its line of road" for delivery at any other point upon its line of road "to some other carrier or company for further carriage".

The legal issue presented for decision is whether the provisions of the 1911 contract, as extended, which reserve to P. & P. U. the right to make all transfers of C. & N. W. freight traffic destined for terminal delivery or interchange at Peoria and vicinity, which reserve to P. & P. U. all freight traffic originating at points served by its line of railroad and which require the C. & N. W. to serve industries located at points on the P. & P. U. lines only at rates prescribed by P. & P. U. are proscribed by the provisions of Section 5(1) of the Interstate Commerce Act and constitute unlawful restraints upon competition in violation of the antitrust laws.

Section 5(1) provides, in pertinent part:

"Except upon specific approval by order of the Commission as in this section provided, * * * it shall be unlawful for any common carrier subject to this chapter * * * to enter into any contract, agreement, or combination with any other such common carrier or carriers for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof; * * *: *Provided*, That whenever the Commission is of the opinion, after hearing upon application of any such carrier or carriers or upon its own initiative, that the pooling or division, to the extent indicated by the Commission, of their traffic, service, or gross or net earnings, or any portion thereof, will be in the interest of better service to the public or of

economy in operation, and will not unduly restrain competition, the Commission shall by order approve and authorize, if assented to by all the carriers involved, such pooling or division, under such rules or regulations, and for such consideration as between such carriers and upon such terms and conditions, as shall be found by the Commission to be just and reasonable in the premises: * * *."

The federal court decisions applying and construing Section 5(1) are few, and none is found which is precisely in point.

In one of the earliest reported decisions, the courts without reference to either the Interstate Commerce or Sherman Acts held invalid as opposed to public policy a contract between line-haul carriers which provided for the pooling of all traffic between specified points, with uniform rates and a division of revenues from the pooled traffic. Chicago M. & St. P. R. Co. v. Wabash St. L. & P. R. Co., 8 Cir., 61 F. 993. The court said that the illegality tainted the whole contract "and neither of the parties to it can successfully make it the foundation of an action in a court of justice." 61 F. at 998.

United States v. Joint Traffic Ass'n, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259, was a suit to enjoin as a violation of Section 5(1) and the Sherman Act an agreement among railroads to establish uniform rates for their services and to allocate among themselves the markets in which each would offer its services between Chicago and Atlantic coast points. The Supreme Court held that conduct unlawful, but the question of constitutionality of the Sherman Act forced Section 5(1) considerations into the background.

Lee Line Steamers v. Memphis, H. & R. Packet Co., 6 Cir., 277 F. 5, was a decision under the antitrust laws,[11] but,

factually, the case falls within the area of Section 5(1) proscription. That case arose upon a contract for the joint use of wharf facilities and warehouses at Mississippi River points in Tennessee, Arkansas and Mississippi by two competing steamboat lines, coupled with an agreement dividing the traffic and revenues on a 50-50 basis. Upon a demurrer to the complaint invoking the Sherman Act, the court held the contract illegal *per se* inasmuch as it involved a division of traffic and an agreement not to compete. The court said in part:

"Plainly, the rights of the public were set entirely to one side, and it was left to the mercies of the combination. Against this situation allegations of good motives and intentions are futile. * * * The record leaves no room for the application of the so-called 'rule of reason' as validating the agreement; * * *." 277 F. at 9.

The final federal court decision relevant to this phase of the case is Norfolk Southern Bus Corp. v. Virginia Dare Transp. Co., 4 Cir., 159 F.2d 306, cert. denied 331 U.S. 827, 67 S.Ct. 1349, 91 L.Ed. 1842. Norfolk and Virginia Dare were competitors in the transport of motor freight between Norfolk, Virginia, and Elizabeth City, North Carolina. They entered into an agreement under which Virginia Dare would use, without charge, Norfolk terminals at the named points provided it made no more than two round trips per week between those points. Section 5(1) was not applicable thereto at the inception of the contract, but subsequently became applicable by amendment of the Act in 1940. The court held that the agreement should have been submitted to the I.C.C. for approval when Section 5(1) became applicable thereto. Since it had not been so submitted for approval, the agreement was held to be void and unenforcible. 159 F.2d at 310–311.

---

11. At the time of the Lee decision, the antipooling statute did not apply to steamboats, although the present section does. 49 U.S.C.A. § 5(1), with reference to Part III of the Act, 49 U.S.C.A. § 301 et seq.

In Boston & M. R. Pooling Application, 298 I.C.C. 703, 712, in rejecting an application for approval of a pooling agreement, the I.C.C. said that surrender of the right to solicit business, whether partial or total, "inevitably results in a division of traffic where such surrender is effectuated by an agreement between competing carriers. The fact that the revenues are permitted to accrue to the carriers performing the transportation does not alter the nature of the agreement as a division of traffic." The agreement there was disapproved, *inter alia,* because "the agreement is intended to impose a limitation upon the freedom of Boston & Maine to solicit traffic for the New Haven gateways." Supra, at 711. The I.C.C. followed its earlier decision in Geitz Storage & Moving Co., Inc., et al, 65 M.C.C. 257, disapproving a contract by local movers to book all interstate traffic through United Van Lines, with a corollary provision that United would not solicit traffic for its own account in certain areas except through the agency of the locals. Referring to that case in the Boston & Maine case, supra at 710, the Commission said:

> "The action of United in not soliciting traffic for its own account amounts to a surrender of all traffic, in which United and its agents have competitive interests, to the discretion of the agent, and is such a surrender as to constitute a pooling arrangement."

In Ex Parte No. 76, Express Contract, 59 I.C.C. 518, the I.C.C. considered a contract between American Railway Express Agency and the major railroads under which the railroads agreed that Express Company was to handle all express business originating or terminating on the lines of the signatory railroads. The I.C.C. held that contract subject to Section 5(1), saying:

> "While primarily the provision plainly has in contemplation independently operated railroad lines competing with each other in rates, and services pertaining to freight traffic, the language is broad enough

to include all operations productive of railroad revenues."

In a later report of the Express Company case, 275 I.C.C. 739, 742, the I.C.C. said that Section 5(1) applied because of "the fact that as an alternative [to the Express contract] the individual rail carriers might have chosen to handle their express business independently, as some of them had done in an earlier period, and the potential competition brought the proposed transaction under Section 5(1)."

In considering a like provision in the Pullman Company decision, 268 I.C.C. 473, 478, restraint of potential competition by railroads in offering their own sleeping car service was cited as bringing a proposed contract for Pullman to provide such service on the nation's railroads within Section 5(1).

█ Although none of the cited cases are precisely in point, I conclude that the 1911 contract, as extended, is a pooling agreement within the meaning of Section 5(1) to the extent that it purports to reserve to P. & P. U. all terminal and intermediate switching service within the Peoria vicinity and to reserve to P. & P. U. all freight originating or terminating on its lines. Plaintiff was a potential competitor of P. & P. U. for such service at all material times. It is now an active competitor in its Sommer operation and in the operation of its M. & St. L. division, competition which forms the basis for P. & P. U.'s present counterclaim.

As the I.C.C. has interpreted Section 5(1) in the Geitz, Boston & Maine, Railway Express and Pullman decisions, plaintiff's surrender of the right to compete, even though it affects only a part of the total business of both plaintiff and P. & P. U., would constitute the contract a pooling agreement requiring I.C.C. approval for its validity. Norfolk & Southern Bus Co. v. Virginia Dare Transp. Co., supra. The I.C.C. interpretation of the statute is entitled to great weight. McLean Trucking Co. v. United States, 321 U.S. 67, 68–69, 64 S.Ct. 370, 88 L.Ed. 544.

■ Although P. & P. U. admits that the agreement has never been submitted to the I.C.C. for Section 5(1) approval, it argues that I.C.C. approval of the agreement upon plaintiff's application under Section 5(2) in F.D. No. 15354 is tantamount to Section 5(1) approval. That argument must fail.

Section 5(2), 49 U.S.C.A. § 5(2), provides that the I.C.C. may approve an agreement for the joint use of facilities by two or more carriers if it finds that such joint use "will be consistent with the public interest." The standard for Section 5(1) approval is more restrictive. Thus, the I.C.C. may approve a pooling agreement under 5(1) only if it finds that such pooling "will be in the interest of better service to the public or of economy in operation, and will not unduly restrain competition."

■ Section 5(1) is explicit in its provisions. The precise standards fixed by Congress may not be diluted by application of a doctrine of implied ratification. Cf., United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225–227, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Maryland & Virginia Milk Producers' Ass'n, D.D.C., 167 F.Supp. 799, 808, aff'd 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880. Before a pooling agreement becomes lawful, it must have been submitted to the I.C.C. upon an application invoking Section 5(1), Cf., Norfolk & Southern Bus Corp. v. Virginia Dare Transp. Co., supra, 159 F.2d at 310–311, and approval must have been granted upon express findings in accordance with the statutory standard.

To the extent hereinabove indicated, the 1911 contract violates Section 5(1) and is void and unenforcible.

In my opinion, the contract is illegal and void to the same extent under Section 1 of the Sherman Act, 15 U.S.C.A. § 1, which provides that any agreement in restraint of trade or commerce among the several states is illegal.

■ The provisions of the contract which require plaintiff to deliver to P. & P. U. all traffic destined to industries or other railroads at or near Peoria and Pekin and those which reserve to P. & P. U. all traffic originating or terminating at industries on its line, if valid, would prohibit plaintiff from serving industries accessible to its lines and from establishing interchange connections with any other railroad for its own account. Thus, the contract, in that respect constitutes an agreement not to compete in P. & P. U.'s area of operations in terminal delivery or interchange traffic, and not to compete with P. & P. U. in the matter of soliciting for its own account or fixing rates for traffic moving in the Peoria-Pekin area served by P. & P. U.'s lines.

■ The Keystone of the Sherman Act is competition, and agreements and practices in restraint of competition without "any redeeming virtue" are *per se* unreasonable and therefore invalid. Northern Pacific R. Co. v. United States, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545. Among practices which have been held to be *per se* violations are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 84 L.Ed. 1129, division of markets and territory, Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199; United States v. Addyston Pipe & Steel Co., 85 F. 271, aff'd 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, and tying arrangements, Northern Pacific R. Co. v. United States, supra; International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.

To some extent, each of those practices is reflected in this contract. By its contract, plaintiff agreed not to compete with P. & P. U. for freight traffic originating at any point on P. & P. U.'s lines. It could participate in that traffic only by accounting to P. & P. U. for its participation, and at rates established by P. & P. U. The contract requires that all car traffic of plaintiff coming into, going out of or through the Peoria-Pekin area, whether destined for terminal delivery or intermediate interchange with other roads, be switched and handled by P. & P. U., irrespective of the existence of C. & N. W. facilities for terminal de-

livery or direct interchange thereof. Although plaintiff lacks direct access to the lines of most of the trunk line railroads serving the area and would require the intermediate service of a terminal road to effect interchange therewith, the contract makes no distinction between that area of need and the area in which plaintiff may interchange directly with roads to the lines of which it has access. P. & P. U.'s service is extended under the agreement on an all or nothing basis.[12] Finally, the contract provides that C. & N. W. trains might enter Peoria only over the lines of P. & P. U.[13]

In the Norfolk case, it is said that the Sherman Act proscribes any agreement which results in a substantial lessening of competition in the facilities and services available to the public. 159 F.2d at 310. Each of the summarized provisions of the 1911 contract imposes a substantial restraint upon competition and each, in the absence of I.C.C. approval, is *per se* unreasonable and void.

As P. & P. U. points out, the beneficent place of the terminal company as a part of the big picture of railroad operations was recognized by the Court in United States v. Terminal Railroad Ass'n, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810. That was a suit by the United States under the antitrust laws to enjoin the consolidation of the three principal terminal railroad systems serving the St. Louis, Missouri gateway. While the court held that consolidation of facilities to be lawful, if conditioned upon proper safeguards, it remanded the case to the lower court with directions to enter an order enjoining certain restraints of competition, including the continued use by the Association of the provision in its agreements with proprietary lines requiring such lines to use only the facilities of the Association for handling freight under their control moving to or through or from the St. Louis gateway. Thus, the decree ordered by the court enjoined, as monopolistic, the continued use of a contract provision of the precise nature which P. & P. U. by its counterclaim seeks to enforce in this case.

It is immaterial to decision of the issues presented that plaintiff acquiesced in the contract and operated thereunder until 1957 or that plaintiff sought and obtained I.C.C. approval of the extension thereof. The principle of estoppel may not be invoked to compel plaintiff to do, or to continue to do, an unlawful act. Louisville & N. R. Co. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 269–271, 55 L.Ed. 297; Pittsburg, C. C. & St. L. R. Co. v. Fink, 250 U.S. 577, 582–583, 40 S.Ct. 27, 63 L.Ed. 1151.

I conclude that the 1911 contract, as extended, insofar as it reserves to P. & P. U. all terminal delivery and interchange service at the Peoria-Pekin gateway and all traffic originating on its lines and insofar as it provides that P. & P. U. may fix the rates for all traffic moving within its area from points served by its lines is, *per se*, an unlawful restraint of competition and void.

Illinois Central R. Co. v. Michigan Central R. Co., 18 Ill.App.2d 462, 152 N.E.2d 627, in which P. & P. U. seeks solace, is distinguishable from the case at bar. There the court enforced an agreement for the joint use by Michigan of I.C. terminal facilities in Chicago. It does not appear from the reported opinion that Michigan was restricted to the use of I. C. services and no other or that any con-

---

12. In like measure, the contract makes no distinction between industries accessible to C. & N. W. lines and industries not accessible to its lines which may be served only by employing the services of another carrier.

13. With respect to the latter provision, C. & N. W., of course, cannot extend its lines into Peoria or gain access to Peoria by the purchase of other roads or track-

age rights without I.C.C. approval. Under present circumstances, the agreement to enter Peoria only over the lines of P. & P. U. is *per se* unreasonable only to the extent that the contract is invoked to deny to C. & N. W. to enjoy the benefits of joint trackage rights obtained in the Sommer arrangement and to continue established operating practices upon the M. & St. L.

tention was made that the agreement violated the antitrust laws. The import of the decision is that an agreement to pay an annual rental for terminal facilities "so long as" the premises "shall be used for a general passenger station" was enforcible even though not limited in point of time.

Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed. 2d 580, has no application to the case at bar. Tampa and Nashville, entered into a contract whereby Tampa agreed to buy from Nashville all coal needed for operation of its generating plants for a period of 20 years. The contract was upheld against Nashville's contention that it constituted a violation of Section 3 of the Clayton Act. 15 U.S.C.A. § 14. I don't believe that that decision is to be read as a blanket approval of all requirements contracts over antitrust objections in view of the Court's stress upon the fact that this contract covered, at most, one per cent of the coal available from the production area involved.[14]

In any event, the "requirements contract" features of the 1911 contract are not here in issue. It is not contended that plaintiff has not used P. & P. U. service where required by its operations or that it has failed to pay for the services which its operation required. On the contrary, the contention is that plaintiff has refused to use P. & P. U.'s services at Sommer and in the operation of its M. & St. L. division, services which plaintiff does not need.

Parmalee Transp. Co. v. Keeshin, 7 Cir., 292 F.2d 794, has no application to the circumstances here presented. The charge made by the complaint in that case was a conspiracy by divers individuals, including a former member of the I.C.C., and divers railroads to eliminate competition in bidding for an inter-terminal transfer contract. The companion case to Parmalee[15] involved only the question of the constitutionality of a city ordinance regulating transfer of passengers in interstate commerce.

■ The counterclaim of intervener presents no genuine issue of fact for decision. Assuming, *arguendo*, that its estoppel theory is legally sufficient to state a claim against plaintiff in any event, an estoppel may not be invoked to compel the doing, or continuation, of an unlawful act.

The case is an appropriate one for summary judgment, and judgment will be entered declaring the 1911 contract, as extended, void and unenforcible to the extent that it:

a. Reserves to P. & P. U. all rail traffic originating at points upon its lines;

b. Reserves to P. & P. U. the right to transfer, switch and handle all C. & N. W. traffic coming into, or going out of, or through Peoria and vicinity;

c. Reserves to P. & P. U. the right to establish rates for all traffic originating at all points upon its lines for delivery of trans-shipment at any other point upon its lines; and

d. Requires that all trains of C. & N. W. entering Peoria must enter over the tracks of P. & P. U. to the extent that enforcement of that provision would interfere with plaintiff's normal interchange operations at Sommer and with the operation of the M. & St. L. division.

An injunction is ordered which shall permanently enjoin P. & P. U. from enforcing, or attempting to enforce, such provisions of the contract.

The counterclaims of P. & P. U. and intervener are denied.

Plaintiff shall prepare and submit to the court within 15 days a judgment and injunction order in accordance herewith.

14. By contrast, P. & P. U. in 1959 conducted 91% of the terminal railroad business at the Peoria gateway. See St. Louis, S. & P. R. Co. v. Peoria & P. U. R. Co., 26 I.C.C. 226, 235, in which the I.C.C. stated that P. & P. U., as of the date of that decision, "practically controls the use of Peoria as a gateway for interstate traffic."

15. City of Chicago v. Atchison, T. & S. F. R. Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L. Ed.2d 1174.