319 F.2d 117
 CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a corporation, Plaintiff-Counter-Defendant-Appellee,
v.
PEORIA AND PEKIN UNION RAILWAY COMPANY and Illinois Central Railroad Company, Defendants-Counterclaimant-Appellants.
CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a corporation, Plaintiff-Counter-Defendant-Appellee,
v.
UNITED STATES TRUST COMPANY OF NEW YORK, as Trustee, Intervenor-Defendant and Counterclaimant-Appellant,
CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a corporation, Plaintiff-Counter-Defendant-Appellee,
v.
CHICAGO AND ILLINOIS MIDLAND RAILWAY COMPANY, Defendant-Appellant.
CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a corporation, Plaintiff-Counter-Defendant-Appellee,
v.
PEORIA AND EASTERN RAILWAY COMPANY, Defendant-Appellant.
CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a corporation, Plaintiff-Counter-Defendant-Appellee,
v.
The NEW YORK, CHICAGO AND ST. LOUIS RAILROAD COMPANY, Defendant-Appellant.
 Nos. 13927-13931.
 United States Court of Appeals Seventh Circuit.
 May 14, 1963.
 Rehearings Denied August 5, 1963.
 
 Donald G. Beste, Peoria, Ill., Herbert J. Deany, W. S. Bodman, Chicago, Ill., William J. Voelker, Jr., John M. Elliott, Peoria, Ill., for appellant.
 John C. Danielson, Chicago, Ill., for appellee.
 Before DUFFY, CASTLE and SWYGERT, Circuit Judges.
 DUFFY, Circuit Judge.
 
 
 1
 Plaintiff, Chicago and North Western Railway Company (North Western) filed this suit for a declaratory judgment against Peoria and Pekin Union Railway Company (P&PU), Illinois Central Railroad Company (Illinois Central), the Peoria and Eastern Railway Company, the New York, Chicago and St. Louis Railroad Company (Nickel Plate), and the Pennsylvania Railroad Company. The United States Trust Company of New York (Trustee) as the trustee under a first mortgage executed by defendant P&PU to secure a bond issue, was allowed to intervene as a defendant and counterclaimant.
 
 
 2
 This appeal involves the validity of a contract entered into on December 1, 1911 between North Western and P&PU for the use by North Western of P&PU's tracks and facilities in and near Peoria, Illinois, and for switching and terminal services by P&PU for North Western. In 1946, this contract was extended to February 1, 1981.
 
 
 3
 In its original complaint filed in 1957, North Western alleged it had begun direct interchange with Toledo, Peoria and Western Railroad Company (TP&W) at Sommer, which is located in the vicinity of Peoria, Illinois, and that P&PU had objected and claimed that such operations violated North Western's contract with P&PU and had demanded an accounting. North Western asked for a declaratory judgment that such direct interchange did not violate the contract.
 
 
 4
 In May 1961, North Western filed an amended complaint alleging it had acquired the assets of Minneapolis and St. Louis Railway Company (M&St.L); that M&St.L had previously directly interchanged with other rail carriers in Peoria and had continued such operations as a division of North Western since the date the latter purchased its assets; that the Interstate Commerce Commission (ICC) had approved North Western's direct interchange operations with TP&W. The amended complaint further alleged that certain provisions of the contract giving P&PU the exclusive right to perform terminal, industrial and intermediate switching for North Western in and around Peoria were invalid because they violated the Interstate Commerce Act and the antitrust laws of the United States. P&PU filed a counterclaim and an amended counterclaim. In the latter, P&PU sought an accounting and an order enjoining further breaches of the contract by North Western.
 
 
 5
 The Trustee filed a petition to intervene, alleging the rights of P&PU under the contract had been conveyed as security for a bond issue and that if the contract were found to be invalid, the security would be impaired. The District Court permitted the Trustee to intervene. The Trustee filed an answer, alleging the contract was valid and that North Western was estopped to claim the contract was invalid.
 
 
 6
 Plaintiff and P&PU each served interrogatories and requests for admissions. Plaintiff then filed a motion for summary judgment alleging certain provisions of the contract constitute a pooling of railroad services which, for lack of approval by the Interstate Commerce Commission under Section 5(1) of the Interstate Commerce Act, violates not only that statute, but also the antitrust laws of the United States.
 
 
 7
 The Court granted the motion for summary judgment and dismissed the counterclaims of P&PU and the Trustee. The Court later reinstated P&PU's counterclaim and ordered it severed for trial. Judge Mercer filed a detailed and carefully considered opinion which has been published in 201 F.Supp. 241.
 
 
 8
 Some statement of the background of this controversy seems necessary. Historically, P&PU was organized by certain proprietary railroad lines to handle terminal and switching traffic in the city of Peoria, Illinois. The rights and obligations of these proprietary lines and of P&PU were defined by a contract dated February 1, 1881. That contract is still in effect and has been extended for a term to February 1, 1981. Illinois Central (IC), Peoria and Eastern (P&E), Nickel Plate, Chicago and Illinois Midland (C&IM) and Pennsylvania are successors in interest to the original proprietary lines and to the rights and obligations under the 1881 contract.
 
 
 9
 With relationship to Peoria, North Western is a north-south trunk line railroad operating from Chicago to St. Louis, Missouri. Its main line passes westerly of the Peoria city limits and transverses among other places in the Peoria area, Kickapoo Junction, Sommer and Hollis. TP&W is an east-west trunk line railroad. Its line intersects the main line of North Western at or near Hollis.
 
 
 10
 Prior to March 6, 1957, North Western and TP&W constructed a new track connection between their respective lines at Sommer, located several hundred feet south of Hollis and designed to permit the direct interchange of freight between the two lines. Such interchange was commenced on March 6, 1957 and has since continued. North Western and TP&W obtained approval of construction of the connecting line and of the arrangement for direct interchange of traffic from the Interstate Commerce Commission. F.D. No. 19922.
 
 
 11
 The controversy before us revolves principally around three clauses of the contract dated December 1, 1911 between North Western and P&PU. The italicized portions of the clauses which follow hereafter were declared unenforceable and enjoined by the District Court. In pertinent part these clauses are:
 
 
 12
 "Fourth: [P.&P.U.] shall receive on its tracks and terminal facilities in and near the City of Peoria, all loaded and empty freight and other cars of the lessee intended for transfer by the [P.&P.U.] from and to all freight houses, warehouses, packing houses, * * * and other industries, and to and from the tracks and warehouses of other railroads with any of which any of the tracks of the said [P.&P.U.] shall at any time be connected, * * *; and subject to the conditions, reservations and payments hereinafter mentioned and provided for, the said [P.&P.U.] to which is expressly reserved the right to make any and all such transfers, * * *"
 
 
 13
 "AA * * *. And all of the loaded and empty freight cars of the said lessee coming into or going out or through said City of Peoria, shall be delivered to the said [P.&P.U.] to be transferred, switched or handled by it for said lessee; * * *"
 
 
 14
 "FF * * *; but [P.&P.U.] hereby reserves to itself the entire local freight and passenger business between the termini of its main tracts and their connection of the same with the tracks of the said lessee as above provided, and between all other points on its line of railroad, and also reserves all freight and passenger business that may originate at any point or station on its line of road and be carried to any other point or station on its line of road there to be delivered to some other carrier or Company, for further carriage; said lessee shall not participate therein, except upon such terms as shall be extended to it, * * * and upon a schedule of rates therefor to be prescribed by said [P.&P.U.] and to be observed by all Companies using said track, * *"
 
 
 15
 North Western emphasizes that the District Court's decree declared the 1911 contract, as extended, void and unenforceable only to the extent that it a) reserves to P&PU all rail traffic originating at points upon its lines; b) reserves to P&PU the right to transfer, switch and handle all North Western traffic coming into, or going out of, or through Peoria and vicinity; c) reserves to P&PU the right to establish rates for all traffic originating at all points upon its lines for delivery or trans-shipment at any other point upon its lines, and d) requires all trains of North Western entering Peoria must enter over the tracks of P&PU.
 
 
 16
 The position of P&PU is that the 1911 contract vests in it an exclusive right to make up and break up North Western trains moving to, out of or through Peoria and vicinity. It asserts the right to handle all cars destined to or from consignees or shippers within the area or destined for interchange with all other railroads with which the lines of P&PU connect. It claims the right additionally to fix the rates to be charged for all freight moving to or from industries, shippers and consignees of freight which are served by its lines.
 
 
 17
 Plaintiff's position is that it will honor the obligations of its contract and employ the services of P&PU for the interchange of all traffic consistent with its needs and in all instances in which it has no facilities for direct interchange. It contends, however, that North Western and P&PU are competitors in those areas in which North Western lines are directly connected with other railroads as, for example, at Sommer. Plaintiff further insists that the 1911 contract constitutes a pooling of railroad services which has not been approved by the ICC under Section 5(1) and which, for want of ICC approval, is a violation of the Interstate Commerce Act and an unlawful restraint of competition prohibited by the antitrust laws.
 
 
 18
 The basic issue on this appeal is whether the District Court properly concluded that the course of business conduct required by the three clauses hereinbefore described, constituted pooling of railroad services and traffic; also whether such conduct would be a violation of Section 1 of the Sherman Act (15 U.S.C. § 1).
 
 
 19
 The Interstate Commerce Act enacted in 1887 specifically prohibited the pooling of railroad freights and revenues. But later amendments including the Transportation Act of 1920 and the Transportation Act of 1940 changed the provision somewhat. At the time of the commencement of this action, the provision prohibits the pooling of freight, services or revenue except where the Commission, granting specific approval under Section 5(1) (49 U.S.C. § 5(1)), finds the public interest will be enhanced by the pooling, and that no unnecessary competitive restraints are involved.
 
 
 20
 Under the terms of the 1911 contract, North Western is bound to offer no switching service (intermediate or terminal service) in the described area, and to give all this freight and service to P&PU. The District Court stated the matter well in its opinion, 201 F.Supp. 241, at page 254:
 
 
 21
 "The provisions of the contract which require plaintiff to deliver to P.&P.U. all traffic destined to industries or other railroads at or near Peoria and Pekin and those which reserve to P.&P.U. all traffic originating or terminating at industries on its line, if valid, would prohibit plaintiff from serving industries accessible to its lines and from establishing interchange connections with any other railroad for its own account. Thus, the contract, in that respect constitutes an agreement not to compete in P.&P.U.'s area of operations in terminal delivery or interchange traffic, and not to compete with P.&P.U. in the matter of soliciting for its own account or fixing rates for traffic moving in the Peoria-Pekin area served by P.&P.U.'s lines."
 
 201 F.Supp. on page 253:
 
 22
 "Although none of the cited cases are precisely in point, I conclude that the 1911 contract, as extended, is a pooling agreement within the meaning of Section 5(1) to the extent that it purports to reserve to P.&P.U. all terminal and intermediate switching service within the Peoria vicinity and to reserve to P. &P.U. all freight originating or terminating on its lines. Plaintiff was a potential competitor of P.&P.U. for such service at all material times. It is now an active competitor in its Sommer operation and in the operation of its M.&St.L. division, competition which forms the basis for P.&P.U.'s present counterclaim."
 
 
 23
 We agree with the District Court that North Western and P&PU are competitive at Peoria. North Western now interchanges directly with TP&W, Rock Island and Peoria Terminal. This competition stems from North Western's ability to eliminate switching by the direct interchanges and to use Peoria Terminal for intermediate switching. There is a saving to North Western's customers by this elimination of P&PU's service.
 
 
 24
 The District Court further stated 201 F.Supp. page 251: "Unquestionably, upon the pleadings alone and undisputed geographic facts, plaintiff and P.&P.U. are, in fact, competitors in those limited areas where plaintiff has direct access to the lines of other trunk line railroads. In a larger area, which is immaterial to this cause, plaintiff and P.&P.U. are end to end roads and not competitors."
 
 
 25
 An example of how the public would be hurt by enforcement of the three anti-competitive clauses is demonstrated by the Cilco case. Central Illinois Light Company (Cilco), in 1957, constructed a new coal-burning plant south of Peoria. Cilco insisted that if its rail coal had to be delivered through P&PU, it would abstain from rail delivery since neither P&PU's rates nor service were competitive and that the increase of cost to Cilco's customers would be $101,500 per year.
 
 
 26
 North Western assumed the obligation of serving the Cilco plant from its right-of-way adjacent to it on the west, and established a connection at Sommer with TP&W, the railroad which served coal mines in a nearby county and which mines produced coal which was suitable for Cilco's use.
 
 
 27
 A proceeding was had before the Interstate Commerce Commission culminating in authority for North Western and TP&W to serve Cilco from Sommer. P&PU intervened claiming the provision of its 1911 contract precluded North Western from serving Cilco and from interchanging with TP&W except over P&PU's lines. The Commission approved the proposed operation but left the resolution of the contract provisions for disposition in an appropriate court.
 
 
 28
 In the proceeding, the Interstate Commerce Commission found that switching by P&PU of traffic now interchanged between applicants at Peoria originating or terminating in the industrial area is "inadequate, wasteful, and unnecessary transportation and results in undue delays."
 
 
 29
 Although the 1911 contract was never approved by ICC under Section 5(1), P&PU refers to the proceedings of the ICC in 1946 where proceedings were had under Section 5(2) (49 U.S.C. § 5 (2)). However, the 1946 proceedings cannot be substituted or take the place of proceedings under Section 5(1). The Commission never made the findings required under Section 5(1) that the pooling provisions of the joint use contract "* * * will be in the interest of better service to the public or of economy in operation, and will not unduly restrain competition * * *."
 
 
 30
 Whatever may have been the case in 1911, at least since 1946 the provisions of the contract hereinbefore described and discussed, constituted a pooling of railroad services. The Interstate Commerce Commission has never been asked to, and never has attempted to authorize such pooling under Section 5(1) of the Act.
 
 
 31
 P&PU argues that the terminal railroad business is a substantial industry in its own right and that its needs are paramount. A good answer to such a contention appears in Greater Baton Rouge Port Commission v. United States of America, 5 Cir., 287 F.2d 86, 95: "No matter how desirable an agreement may appear, no matter how beneficent the monopoly may appear, Congress has commanded that agreements limiting or destroying competition must first be approved by the [Commission] before they may be lawfully carried out. National policy favors free and healthy competition; monopoly is the exception. * *"
 
 
 32
 We also agree with the District Court that the contested provisions of the 1911 contract violate Section 1 of the Sherman Act. If the contested clause of the contract was sustained, North Western would be required to deliver to P&PU all traffic destined to industries or other roads at or near Peoria and there would be reserved to P&PU all business originating or terminating at industries on its line. It would carve out for P&PU a monopoly of almost all switching traffic in or passing through one of the three great rail gateways in this country. For these competitors to determine among themselves that all this traffic will move by P&PU is a per se violation of the Sherman Act. Northern Pacific Railway Co. et al. v. United States, 356 U.S. 1, 4-5, 78 S.Ct. 514, 2 L.Ed.2d 545.
 
 
 33
 P&PU refers to United States v. Terminal Railroad Association of St. Louis (1912), 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810. In that case, the Government claimed that the acquisition by several proprietary lines of most of the terminal facilities in St. Louis, Missouri, violated the Sherman Act. Although the Court held the joint user arrangement was not unlawful in itself, it ordered the lower court to modify the joint use contract "By eliminating from the present agreement between the Terminal Company and the proprietary companies any provision which restricts any such company to the use of the facilities of the Terminal Company." (224 U.S. page 411, 32 S.Ct. page 516, 56 L.Ed. 810.)
 
 
 34
 Thus the Supreme Court did condemn under the Sherman Act the restrictive conditions while it approved the basic joint user contract.
 
 
 35
 We think the claims by the Trustee that North Western is estopped, are without merit. Also, we hold the claim that Section 16 of the Clayton Act (15 U.S.C. § 26) is applicable, cannot be raised at this time.
 
 
 36
 P&PU also relies upon a decision of this Court in Parmelee Transportation Company v. Keeshin, 7 Cir., 292 F.2d 794. We do not think the Parmelee case is pertinent. Keeshin did not have any contract requiring the railroads not to deal with Parmelee or to refrain from direct interchange or to require passengers to use Keeshin and not to use other means of transportation. All that was involved in Parmelee was joint use by the railroads of the convenient common agent which was similar to the ICC action with reference to the 1946 extension decision hereinbefore referred to.
 
 The judgment of the District Court is
 
 37
 Affirmed.